852 A.2d 132

BRANDON FARMS PROPERTY OWNERS ASSOCIATION, INC.,
PLAINTIFF–RESPONDENT, v. BRANDON FARMS CONDO-
MINIUM ASSOCIATION, INC., DEFENDANT–APPELLANT.

Argued February 19, 2004—Decided July 19, 2004.

Peter O. Hughes argued the cause for appellant (*Ogletree, Deakins, Nash, Smoak & Stewart*, attorneys).

Robert L. Grundlock, Jr., argued the cause for respondent (*Rubin, Ehrlich & Buckley*, attorneys).

Ronald L. Perl submitted a brief on behalf of amicus curiae, *Community Associations Institute, Inc.* (*Hill Wallack*, attorneys; *Mr. Perl, Samuel J. McNulty, Andrew T. McDonald* and *Jessica F. Battaglia*, on the brief).

Justice WALLACE delivered the opinion of the court.

In this case, the primary issue is whether the Condominium Act (Act), *N.J.S.A.* 46:8B–1 to –38, permits a developer to require a condominium association to be responsible for assessments owed by individuals of the association to an "umbrella" organization. The trial court invalidated the scheme. In an unpublished opinion, the Appellate Division reversed. We granted certification, 178 *N.J.* 35, 834 *A.*2d 407 (2003), and we also granted *amicus curiae* status to the Community Association Institute. We now reverse the judgment of the Appellate Division and hold that under the Act, a builder or developer may not make a condomini-

um association responsible for an association member's failure to pay assessments owed to an umbrella organization.

## I.

The essential facts are not disputed. Brandon Farms is a 556–acre development of single-family detached homes, townhouses, and condominiums located in the townships of Lawrence and Hopewell. The Declaration of Covenants and Restrictions (Declaration), filed by the developer, created the Brandon Farms Property Owners Association (Property Owners Association) to serve as the umbrella organization charged with maintaining and managing the common property intended for the beneficial use of all homeowners in the community. Although the Property Owners Association is not responsible for the common elements of the condominiums, which are the responsibility of the respective condominium associations, the Declaration governs both the Property Owners Association and the Brandon Farms Condominium Association (Condominium Association). Section 7.02 of the Declaration authorizes the Property Owners Association to collect and disburse assessments and charges necessary to fulfill its mandate.

Each owner of the 1,293 total units in Brandon Farms, whether single-family house or condominium unit, is a member of the Property Owners Association. Membership is divided into three classes: Class A consists of owners of single-family, detached homes on certain designated parcels; Class B consists of owners of single-family homes and some condominium unit owners who are members of the Twin Pines Condominium Association; and Class C consists of 469 owners of condominium units in the Condominium Association. Thus, the owners of condominium units in Class C are members of both the Property Owners Association and the Condominium Association.

All Class A and C members pay a recreational limited common expense assessment to the Property Owners Association in return for access to the community's swimming pool and clubhouse. Class B members, however, are not assessed that charge, but

must pay an optional recreational facilities fee to use the pool and clubhouse. In addition to the recreational limited common expense assessment paid by members of Class A and Class C, every homeowner in Brandon Farms is responsible for paying a general common expense assessment levied by the Property Owners Association.

The Brandon Farms community also includes affordable housing units pursuant to an Affordable Housing Plan filed with the Mercer County Clerk's office. All affordable housing units are Class C condominiums and the owners are members of the Condominium Association. Those units comprise approximately 28% of the Condominium Association membership and 10.3% of the Property Owners Association membership.

Consistent with the Declaration, owners of affordable housing units pay reduced assessments. The general common expense assessment is apportioned so that affordable housing owners pay 70% of the normal charge. The resulting shortfall is covered through a second tier assessment placed on all non-affordable housing homeowners. Affordable housing owners also pay 50% of the normal recreational limited common expense assessment, with the shortfall apportioned equally among Class A homeowners and non-affordable homeowners in Class C.

The Condominium Association was established pursuant to the Master Deed to manage the common affairs of the Class C members and to maintain the common elements of the condominiums. The Condominium Association assesses its members for costs and expenses separate and apart from the assessments by the Property Owners Association.

Section 7.02 of the Declaration provides, "Each such [Property Owners Association], assessment . . . shall be a continuing lien in favor of the [Property Owners Association] upon the Home against which each such assessment is made and shall also be the personal obligation of the Owner of such Home at the time when the assessment fell due." Section 7.06 of the Declaration provides that all recreational limited common expense assessments "shall

be allocated among all Class A and C Members of the [Property Owners Association]." Although Class A and B members are required to pay their assessments directly to the Property Owners Association, the Condominium Association is responsible for the payment of the assessments of Class C members.

Section 7.21 of the Declaration, which is the critical key area of contention in this case, provides:

Despite anything to the contrary herein, the primary responsibility for the payment to [the Property Owners Association] of all Assessments, other than Miscellaneous Assessments, assessed against Class C Members, shall be that of the Condominium Association rather than that of the individual Class C Members. Therefore, the [Property Owners Association] shall levy an aggregate assessment against the Condominium Association to cover all of the individual Assessments for Class C Members, which Condominium Association shall be responsible for payment of the entire aggregate Assessment when due, together with all appropriate late fees, fines, penalties and charges and [sic] regardless of whether all of the individual Class C Members pay the Condominium Association or not.

Initially, the Property Owners Association directly billed and collected assessments from all members, including Class C members. When the developer no longer controlled the Property Owners Association, the homeowners in control sought to enforce the provision of section 7.21 that required the Condominium Association to be responsible for the collection and payment of assessments owed by Class C members. The Condominium Association refused to undertake those responsibilities.

On September 11, 2001, the Property Owners Association filed a complaint in the Chancery Division alleging that the Condominium Association breached section 7.21 of the Declaration and demanding immediate payment of all outstanding assessments, late fees, fines, penalties and charges. The Condominium Association answered generally denying the allegations. Subsequently, parties agreed to a stipulated statement of facts and filed cross-motions for summary judgment.

The stipulation provided that (1) as of November 13, 2001, there were 138 delinquent units of which 59 units or 43% were Class C units; (2) the total delinquent amount for all Property Owner Association members was $23,528.90 of which the Condominium

Association members accounted for $14,266.65, and (3) Class A and B members were insulated from having to compensate for the default as to Property Owners Association assessments to Class C members, but Class C members nevertheless had to contribute for the defaults of Class A and B members.

The trial court found that section 7.21 of the Declaration was void and unenforceable because it violated the Act by requiring Class C members to be solely responsible for Class C deficiencies while requiring all classes to make up for the delinquencies of Class A and B members. The court held that "[w]hile [section] 7.21 is not expressly in violation of the Act, the letter and spirit of the Act are undermined by this provision." The court ordered the Property Owners Association to "collect its assessment from each individual unit owner and spread any deficiencies thereafter evenly among all the classes and members of the [Property Owners Association]."

The Property Owners Association appealed. The Appellate Division reversed. The court noted, "[T]he regulatory framework created by the Declaration is not unlike many governance schemes used to oversee the common properties and recreational facilities in other planned unit developments." The panel held that section 7.21 did not violate the Act because that section rendered the assessments "common expenses" of the condominium units. Further, the panel concluded that the developer had a reasonable basis for implementing section 7.21 and that that provision was enforceable. Condominium Association's motion for reconsideration or clarification was denied.

## II.

The Condominium Association contends that section 7.21 is void and unenforceable because it violates the letter and spirit of the Act by treating the Condominium Association members as a unit rather than individually. The Condominium Association claims it is inequitable to hold it responsible for the full assessment, regardless of whether the unit owner pays, when the Condomini-

um Association is not a member of the Property Owners Association. Further, the Condominium Association contends that the developer designed section 7.21 to insulate Class A and B members from the risk of non-payment of assessments by affordable home owners in Class C to make sales of Class A and B units more attractive. It asserts that this governance scheme is contrary to public policy because of the disproportionate and negative impact on affordable homeowners.

The Property Owners Association maintains that the trial court erred in applying the Act to an umbrella Property Owners Association and in declaring section 7.21 void. It asserts that section 7.21 must be given full effect because the Declaration is a lawfully recorded instrument under which thousands of homeowners have purchased their homes. With respect to the affordable housing units, it asserts that the additional expenses generated by affordable housing units are borne by all members of the Property Owners Association and that, in any event, affordable unit owners who pay their assessments do not create a problem. It maintains that the class distinctions within the community simply reflect a different status with regard to recreational facility access, and that without section 7.21, Class C members who fail to pay the assessment would unfairly impose financial burdens on Class A and B members. It argues that section 7.21 does not violate the Act or any other law because the assessments clearly constitute a common expense as defined in *N.J.S.A.* 46:8B–3e and thus the Condominium Association is obligated to pay the assessments on behalf of its members.

### III.

The Act, adopted in 1970, establishes a comprehensive scheme for regulating condominiums and their associations. *Fox v. Kings Grant Maint. Ass'n,* 167 *N.J.* 208, 218, 770 *A.2d* 707 (2001). A condominium is defined as "the form of ownership of real property under a master deed providing for ownership by one or more owners of units of improvements together with an undivided

interest in common elements appurtenant to each such unit."
*N.J.S.A.* 46:8B–3h. The developer must "execute and file a master deed describing the land, identifying the units, defining the common elements, and providing for an association of unit owners." *Fox, supra,* 167 *N.J.* at 218, 770 *A.2d* 707 (citing *N.J.S.A.* 46:8B–9). The condominium property consists of all the land and property covered by the master deed and all improvements. *N.J.S.A.* 46:8B–3i. The individual owner of a condominium unit owns the unit, *N.J.S.A.* 46:8B–3q, along with a "proportionate undivided interest in the common elements," *N.J.S.A.* 46:8B–6. Each unit owner is responsible for a proportionate share of the common expenses, which includes "(i) all expenses of administration, maintenance, repair and replacement of the common elements; (ii) expenses agreed upon as common by all unit owners; and (iii) expenses declared common by [the Act] or by the master deed or the bylaws." *N.J.S.A.* 46:8B–3e. If the unit owner fails to pay the common expenses charged to the unit, that amount shall be a lien against such unit. *N.J.S.A.* 46:8B–17. A unit owner is presumed to have agreed to pay his proportionate share of common expenses and may not avoid liability for those expenses by waiver of the right to use the common elements. *Ibid.* Accordingly, a unit owner having a fee simple title "enjoys exclusive ownership of his or her individual unit, [retains] an undivided interest as a tenant in common in the [common] facilities [and grounds,]" *Fox, supra,* 167 *N.J.* at 219, 770 *A.2d* 707, and is required to pay a proportionate share of the common expenses, *N.J.S.A.* 46:8B–3e.

The Act provides that a condominium association "shall be responsible for the administration and management of the condominium and condominium property, including but not limited to the conduct of all activities of common interest to the unit owners." *N.J.S.A.* 46:8B–12. The association is charged with the maintenance of the common elements and the "assessment and collection of funds for common expenses and the payment thereof," along with various other duties. *N.J.S.A.* 46:8B–14. The association is authorized to record a lien against any unit owner

for any unpaid assessment duly made by the association. *N.J.S.A.* 46:8B–21a.

Once the unit owners elect a majority of the members of the association's governing board, the developer has sixty days to turn over various documents to the association, including all contracts to which the association is a party. *N.J.S.A.* 46:8B–12.1d. The Act declares that:

> Any management, employment, service or maintenance contract or contract for the supply of equipment or material which is directly or indirectly made by or on behalf of the association, prior to the unit owners having elected at least 75% of the members of the governing board ... shall not be entered into for a period in excess of two years. Any such contract or lease may not be renewed or extended for periods in excess of two years and at the end of any two-year period, the association may terminate any further renewals or extensions thereof.
>
> Notwithstanding the above, any management contract or agreement entered into after the effective date of this amendatory act shall terminate 90 days after the first meeting of a governing board ... in which the unit owners constitute a majority of the members, *unless the board ratifies the contract or agreement.* [*N.J.S.A.* 46:8B–12.2 (emphasis added).]

Any agreement contrary to the Act is void. *N.J.S.A.* 46:8B–7. The Act neither provides for nor prohibits the creation of an umbrella association. The Act states only that the legal structure of a condominium association may take the form of "any entity recognized by the laws of New Jersey, including but not limited to a business corporation or a nonprofit corporation." *Fox, supra,* 167 *N.J.* at 223, 770 *A.*2d 707 (quoting *N.J.S.A.* 46:8B–12). Nevertheless, our courts have recognized and approved the use of umbrella associations in a planned unit development. *Ibid.* (citing *State v. Panther Valley Prop. Owners Ass'n,* 307 *N.J.Super.* 319, 327, 704 *A.*2d 1010 (App.Div.1998), and *Holbert v. Great Gorge Vill. Condo. Council, Inc.,* 281 *N.J.Super.* 222, 225–228, 656 *A.*2d 1315 (Ch.Div.1994)); Wendell A. Smith & Dennis A. Estis, *New Jersey Condominium & Community Association Law* § 4.1c (2003).

In *Fox,* we addressed the powers and responsibilities of an umbrella property owners association in connection with a condominium association. There, pursuant to the direction of the

municipal planning board, the Kings Grant Planned Unit Development (Kings Grant) included sectionalized communities of single-family homes, townhouses, and condominiums, along with the development of community facilities for all Kings Grant unit owners such as recreational facilities, commercial centers, and open spaces. *Fox, supra,* 167 *N.J.* at 213–14, 770 *A.*2d 707. Kings Grant established an umbrella association to be "fully responsible for 'the maintenance, management, preservation, administration, upkeep and care of *all common property.*' " *Id.* at 215, 770 *A.*2d 707. The declaration filed by Kings Grant provided, "Common property shall also mean and refer to all lands, buildings, improvements and facilities *including, without limitation, common elements as that term is defined in N.J.S.A. 46:8B–1.*" *Ibid.* The declaration also provided "that every sub association within Kings Grant … 'irrevocably delegated' … all of its powers and duties for the maintenance, preservation, administration and operation of common property" to the umbrella organization. *Ibid.* Each unit owner was a member of the umbrella organization but could not participate directly in its management. *Id.* at 216, 770 *A.*2d 707. Instead, each community in Kings Grant elected one delegate for every fifty units to represent its interests. *Ibid.* The chosen delegate cast votes equal to the number of units within the delegate's representative community. *Ibid.*

The last Kings Grant community to be developed was Waters Edge Condominium Community (Waters Edge). *Id.* at 213, 770 *A.*2d 707. Waters Edge's master deed established a condominium association and also declared that "certain powers and duties" of the association were irrevocably delegated to the umbrella organization's board of trustees. *Id.* at 217, 770 *A.*2d 707. A number of Waters Edge unit owners objected to the umbrella organization's interference with the condominium association's affairs. They filed a complaint against the umbrella organization, its project manager, and its board of trustees. *Ibid.* The trial court granted partial summary judgment in favor of the umbrella organization upholding its authority to maintain and manage all of the common property within Kings Grant. *Id.* at 217–18, 770 *A.*2d 707. The

court also granted partial summary judgment in favor of the plaintiffs, finding the umbrella organization had no right to interfere with Waters Edge condominium association's membership meetings and elections. *Id.* at 218, 770 *A.*2d 707. The Appellate Division affirmed. *Ibid.*

Justice Stein, writing for a unanimous Court, reversed, concluding that "a delegation of power to the umbrella association that [goes beyond regulation of] roads, facilities and services shared by all or several of the communities within the Kings Grant project is [not] reconcilable with the Act." *Id.* at 228, 770 *A.*2d 707. In reaching that conclusion, Justice Stein reviewed various provisions of the Condominium Act and explained:

> *N.J.S.A.* 46:8B–12.1 and *N.J.S.A.* 46:8B–12.2 reflect more than the orderly transition of power between the developer and unit owners. They demonstrate the Legislature's understanding that in a condominium community, the unit owners' interests take precedence over any outside interest, whether that interest is a developer, an umbrella association, or any other outside party. Furthermore, those provisions demonstrate that condominium ownership differs significantly from traditional forms of property ownership, and that because unit owners have an undivided interest in their community's common elements any governance scheme that conflicts with the recognition of that interest is inconsistent with and in violation of the Act.
>
> ... The [Act] contains no provision giving the developer the right to use the property interests of ... unit owners as a bargaining chip for the developer's own interests. To the contrary, the Legislature included specific language in the [Act] to prevent a developer's lingering control over a condominium association.
>
> [*Id.* at 225–26, 770 *A.*2d 707.]

Although the Court recognized that an umbrella organization could serve a useful purpose in controlling common elements shared by several associations, it found no intent by the Legislature to diminish the statutory power of condominium unit owners to control their common elements. *Id.* at 228, 770 *A.*2d 707. The Court concluded that the Kings Grant governance scheme that granted irrevocable control over all common elements to the umbrella organization "plainly violate[d] both the letter and spirit of the [Act]." *Id.* at 224, 770 *A.*2d 707.

## IV.

■ We now address the essential issue in this case, whether section 7.21 of the Declaration complies with the Act. The short answer is that it does not.

Condominium Association members are proportionately liable for the payment of all expenses declared common by their master deed. *N.J.S.A.* 46:8B–3e, –17. Section 15.00 of the Master Deed provides: "Owners of Units in the Condominium, in addition to taking title subject to this Master Deed, also take title subject to the [Declaration]. . . . Owners of units in the Condominium are members of the [Condominium Association] and the [Property Owners Association]." However, section 7.21 of the Declaration, requires the Condominium Association, not the unit owners, to be responsible for collection and payment of all Property Owners Association assessments.

The Property Owners Association and *amicus* argue that the relevant assessments are a "common expense" pursuant to *N.J.S.A.* 46:8B–15, and that section 7.21 constitutes an "agreement" under which the Condominium Association acquired an interest in the Property Owners Association. The Appellate Division agreed and concluded that because the Property Owners Association assessments are common expenses under the Act, they should be treated similarly to other common expenses incurred by the Condominium Association in its day-to-day operation. We find several weaknesses in the "agreement" approach.

Initially, we note that the Condominium Association is a corporation and can act only through its officers or governing board, *N.J.S.A.* 46:8B–15a, which never agreed to be responsible for collection and payment of the Property Owners Association assessments owed by Class C members. The "agreement" approach is predicated on the fact that the individual unit owners took title subject to the Master Deed, which incorporates the Declaration that contained section 7.21. Yet, that approach fails to recognize that the unit owners have no authority to bind the Condominium Association; thus, the unit owners could not enter into this

agreement. *N.J.S.A.* 46:8B–16a; *Berman v. Gurwicz,* 189 *N.J.Super.* 89, 106–07, 458 *A.*2d 1311 (Ch.Div.1981), *aff'd,* 189 *N.J.Super.* 49, 458 *A.*2d 1289 (App.Div.), *certif. denied,* 94 *N.J.* 549, 468 *A.*2d 197 (1983) (ruling that recreation lease executed by unit owners before incorporation of Condominium Association, and not adopted subsequently, was unenforceable against association). Section 7:21 neglects to account for the Legislature's intent in the Act "to ensure that the *unit owners*—not the developer—exercise control over their condominium boards" and for the condominium board to make decisions on behalf of its members. *Fox, supra,* 167 *N.J.* at 225, 770 *A.*2d 707.

Further, the Act expressly prohibits the developer from entering into a long-term management contract or agreement on behalf of a condominium association. *N.J.S.A.* 46:4B–12.2. If the developer does enter into such an agreement, once the association sheds the developer's control, the board may ratify or reject it. *Ibid.* Here, the developer created the so-called agreement before the Condominium Association came into existence, and once the Condominium Association existed, it never adopted or ratified, but instead refused to enforce the agreement.

Clearly, the Condominium Association has the authority to enter into an agreement to collect common expenses owed by the individual unit owners. *See N.J.S.A.* 46:8B–13 (requiring bylaws to provide for administration of association and "the manner of collecting from unit owners their respective shares of common expenses"). Absent such an express agreement however, neither the developer nor the umbrella association may bind the Condominium Association to collect and be responsible for the payment of assessments when an individual unit owner fails to pay.

We conclude that the Property Owners Association's attempt to enforce section 7.21 as an agreement violates the Act, and pursuant to *N.J.S.A.* 46:8B–7, any agreement contrary to the Act is void. Consequently, section 7.21 is void and unenforceable.

The Appellate Division also disagreed with the trial court's conclusion that section 7.21 was inequitable because it required

"Class C members to solely bear the burden of Class C deficiencies even though all classes were required to compensate for the default of a Class A or Class B member." The Appellate Division was concerned that declaring section 7.21 void would constitute an invalid abrogation of a restrictive covenant agreed to by all the members of the Property Owners Association.

■ We are satisfied that the trial court properly analyzed that issue in concluding that section 7.21 violates the Act. Because we are in accord with the trial court's analysis, we quote and adopt it as our own.

[T]his court is persuaded that § 7.21 of the Declaration, requiring Class C members to solely bear the burden of Class C deficiencies even though when a Class A or Class B member defaults all classes are required to compensate, is inequitable. While § 7.21 is not expressly in violation of the Act, the letter and spirit of the Act are undermined by this provision.

For example, in discussing responsibility for common expenses of a condominium association under the Act, the New Jersey [L]egislature indicated that unit owners should be charged the "percentage of their respective undivided interests in the common elements," or an amount described in the master deed or bylaws. N.J.S.A. 46:8B–17. Similarly, N.J.S.A. 46:8B–3(e) defines common expenses in part as "expenses for which the unit owners are proportionately liable." When measuring the proportionality of interests called for by the [Act] against the potentially disproportionate allocation of [Property Owners Association] common expenses forced upon Class C members by § 7.21, this court is satisfied the letter and spirit of the Act is being violated.

We recognize that a court's power to declare provisions in a master deed and related documents void as against public policy " 'must be exercised with caution and only in cases that are free from doubt.' " *Briarglen II Condo. Ass'n v. Township of Freehold,* 330 *N.J.Super.* 345, 355–56, 749 *A.2d* 881 (App.Div.), *certif. denied,* 165 *N.J.* 489, 758 *A.2d* 648 (2000) (citation omitted); *see also Vasquez v. Glassboro Serv. Ass'n,* 83 *N.J.* 86, 98–100, 415 *A.2d* 1156 (1980) (recognizing court's power to void contracts violating public policy). We have declared void contracts that "violate statutes, promote crime, interfere with the administration of justice, encourage divorce, violate public morality, or restrain trade." *Vasquez, supra,* 83 *N.J.* at 99, 415 *A.2d* 1156. "The

sources of public policy include federal and state legislation and judicial decisions." *Id.* at 98, 415 *A.*2d 1156.

Section 7.21 puts the developer's interests ahead of unit owners' interests. By insulating single family homeowners in Class A and Class B from the perceived risk of default by affordable housing unit owners and other Class C members, the developer made the single family dwellings in Class A and Class B more attractive. Thus, section 7.21 violates the public policy set forth in the Act by putting the developer's interest in selling Class A and Class B homes ahead of the Condominium Association's interests.

The Property Owners Association facially argues that section 7.21 was designed to take advantage of the Condominium Association's super lien power. However, that argument fails to address the fact that the Declaration affords the Property Owners Association equivalent authorization to create a lien in section 7.02. Similarly, the Property Owners Association's claim that section 7.21 is justified by the classes' differing access to recreational facilities is belied by the fact that Class A members have the same access to the facilities as Class C members.

Moreover, if section 7.21 were enforced, the affordable housing unit owners, who are solely in Class C, would bear a disproportionate burden of their neighbor's delinquencies. Sections 7.05 and 7.06 set forth reduced assessments for affordable housing units. If the assessments are treated as common expenses and collected proportionately from all Class C unit owners, once delinquencies are addressed, the reductions established in the Declaration for affordable housing units would be significantly altered. In that event, an affordable housing unit owner who paid the assessment would be required to pay assessment rates significantly higher than the discounted rates set forth in the Declaration and in amounts substantially higher than that paid by Class A and B members. Thus, a prospective affordable unit buyer relying on the reduced assessment for affordable units would not have realized that section 7.21 might convert the assessment into a

common expense and thereby substantially reduce or eliminate the discount for affordable units.

We recognized in *Fox, supra,* that a delegation of power to the umbrella association limited to roads, facilities, and services shared by all or several of the communities within the planned unit development was reconcilable with the Act. 167 *N.J.* at 228, 770 *A.2d* 707. We now add to that declaration that assessments imposed under such authority should be proportionate to similarly situated unit members of a development to ensure it is consistent with the purposes of the Act. Here, where the assessments by the Property Owners Association result in a disproportionate assessment for affordable housing unit owners and other Class C members who receive the same benefits as Class A members, such assessments violate the letter and spirit of the Act.

## V.

We reverse the judgment of the Appellate Division and reinstate the judgment of the trial court.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.