Mark J. Solowicz, Jesse E. Soltis and Stephen J. Havey, Plaintiffs-Appellants,†

v.

Forward Geneva National, Geneva National Trust, Geneva National Sales Center, LLC, Geneva National Retail Corp., Geneva National Community Assoc., Inc., Geneva National Condominium Master Assoc., Inc., Geneva Woods, Inc.,Harlow GN, LLC, Lowell Management Services, Inc., GN Storage II, LLC, Lowell Properties, LLC, Geneva National Community Services, LLC, Geneva National Development Corp., Foxwood at Geneva National, LLC, Bayside Pointe Land Development, LLC and Paloma Geneva National, LLC, Defendants-Respondents.

Court of Appeals

*No. 2008AP10. Submitted on briefs October 8, 2008. —Decided December 23, 2008.*

2009 WI App 9

(Also reported in 763 N.W.2d 828.)

† Petition to review granted 4/14/09.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Martin J. Greenberg* and *Brad L.F. Hoeschen* of *Greenberg & Hoeschen, LLC* of Milwaukee.

The cause was submitted on the brief of Geneva National Trust by *John P. Brady* and *Bryan W. Edgar* of *Weiss Berzowski Brady, LLP* of Delafield; Geneva National Community Association, Inc. by *Lisle W. Blackbourn* of *Godfrey, Leibsle, Blackbourn & Howarth, S.C.* of Elkhorn; Respondents Geneva Woods, Inc., Harlow GN, LLC, Lowell Management Services, Inc., GN Storage II, LLC, and Lowell Properties, LLC by *David C. Williams* of *Harrison, Williams, McDonell & Swatek, LLP* of Lake Geneva; Geneva National Condominium Master Association, Inc. by *Thomas M. Devine* of *Hostak, Henzl & Bichler, S.C.* of Racine.

A nonparty brief was filed on behalf of Wisconsin REALTORS Assocation by *J. Bushnell Nielsen* of *Reinhart Boerner Van Deuren S.C.* of Waukesha.

Before Brown, C.J., Anderson, P.J., and Snyder, J.

¶ 1. BROWN, C.J. The novel issue in this case is whether the Wisconsin Condominium Ownership Act, WIS. STAT. ch. 703 (2005–06),[1] limits the duration of a developer's control over a master-planned community. In Wisconsin, a condominium developer may maintain control only for three years or until seventy-five percent of the units are sold, whichever comes first, or ten years for an expandable condominium. WIS. STAT. § 703.15(2)(c). Here, the developer still has control eighteen years later, and only fifty-two percent of the maximum allowable units have sold. And, a restrictive

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

covenant grants the developer control until eighty-five percent have sold. Nonetheless, Geneva National is a private quasi-town, not a condominium. It is a master-planned community comprising 1600 acres with single- and multi-family residential homes, commercial and recreational property that caters to people who value its prized golf courses and other recreational options. Because such a complex community requires an extended time to develop and market, we hold that master-planned communities are not subject to ch. 703. Further, we refuse to disturb the restrictive covenant when it clearly and specifically states the duration of the developer's control, a condition that the complainants full-well knew existed before they signed on the dotted line. Therefore, we affirm the grant of summary judgment for the defendants.

¶ 2. The relevant facts of this case are undisputed. The plaintiffs, Mark J. Solowicz, Jesse E. Soltis and Stephen J. Havey (collectively, "Solowicz"), are three condominium unit owners in Geneva National. The defendants are listed in the footnote below.[2] For ease of reference, we will refer to them as the Developer, the Trust or the Association. We begin by explaining the people, documents, and organizations that govern Geneva National because, at bottom, Solowicz's complaint focuses on the community's governing structure.

---

[2] Forward Geneva National, Geneva National Trust, Geneva National Sales Center, LLC, Geneva National Retail Corp., Geneva National Community Assoc., Inc., Geneva National Condominium Master Assoc., Inc., Geneva Woods, Inc., Harlow GN, LLC, Lowell Management Services, Inc., GN Storage II, LLC, Lowell Properties, LLC, Geneva National Community Services, LLC, Geneva National Development Corp., Foxwood at Geneva National, LLC, Bayside Pointe Land Development, LLC and Paloma Geneva National, LLC.

¶ 3.   Geneva National is a master-planned community near Lake Geneva, Wisconsin. It comprises approximately 1600 acres separated into golf courses, clubs, private roadways and utilities, single- and multi-family residential, and commercial uses. The multi-family residential buildings include thirty-two condominiums. Each condominium has an individual condominium instrument and an association to govern its day-to-day maintenance. A buyer purchasing a condominium unit at Geneva National has two declarations recorded against their unit: the Condominium Declaration[3] and the Restrictive Covenant.[4]

¶ 4.   The Condominium Declaration formed, under Wis. Stat. § 703.155, the Condominium Master Association, Inc. The Condominium Master Association serves all residential and select commercial condominiums at Geneva National. The Developer has no control over the Condominium Master Association; control is always vested in the members. Its services are limited to maintenance and administration, and Solowicz does not challenge its powers.

¶ 5.   The Restrictive Covenant promotes the orderly development of Geneva National. Its purpose is to control the effect of the development to preserve the

[3] The full name of the Condominium Declaration is "Declaration of Condominium Ownership and of Easements, Restrictions, Conditions and Covenants for Geneva National Condominium No.__" (with the particular condominium unit number indicated). It was recorded in the register of deeds office on May 22, 1990.

[4] The full name of the Restrictive Covenant is "Declaration of Covenants, Conditions, Restrictions and Easements for Geneva National Community." It was recorded in the register of deeds office one day before the Condominium Declaration, on May 21, 1990.

natural environment, maintain the recreational areas and roadways, and to benefit the property, all according to the Covenant's terms. The Covenant controls development through two governing bodies: the Community Association and the Geneva National Trust. It also reserves certain rights for the Developer.

¶ 6.　Geneva National Trust preserves and maintains the natural environment in Geneva National. The Trust does so by presiding over the Architectural Review Committee, adopting and enforcing architectural standards, implementing rules and regulations governing use of the property, and granting variances to restrictions set forth in the Covenant. The Trust's expenses are ultimately paid by the unit owners through the Association's annual and special assessments.

¶ 7.　The Trust is governed by the majority vote of three trustees, who act "in their sole and absolute discretion, and in so doing, the decisions of the Trustees shall be final in all respects." When a Trustee must be replaced, upon resignation, death or inability to act, the remaining Trustees appoint the successor. The Trust has no obligation to seek prior or subsequent approval from the Association for its actions. If the Trust "is unable or fails or refuses to act" according to its duties, then the Developer may exercise the Trust's powers.

¶ 8.　The Association maintains Geneva National's private roadways, medians, entrances and property, and provides utilities. To do this, it can obtain loans and hire outside management or other professionals. The Association can also levy assessments on property owners and "take any other lawful action necessary in the sole and absolute discretion of the Board of Directors to exercise all powers and discharge all duties and responsibilities and all liabilities of the . . . Association pursu-

218

ant to [the Covenant,] and to carry out the purposes and intents of this [Covenant]." For example, at the Developer's request, the Association's board approved an upgrade of a front gate and gazebo. The Association assessed unit owners $850,000 to fund this upgrade. To make a special assessment like this, the board need not seek the unit owners' approval, though it may seek input from them.

¶ 9. Five classes of voting members control the Association's board of directors: club owners, including the golf club, commercial property owners, multiple-family unit owners, single-family unit owners, and the Developer. Each class elects a representative to sit on the Association's board of directors. Each representative may cast four votes, except that the commercial property representative may cast only three votes, for a total of nineteen votes.

¶ 10. Article IX of the Covenant also grants the Developer power to appoint and remove officers or directors, amend the Covenant and execute documents and take actions necessary or desirable to its power. To appoint or remove, the Developer must determine that such member, officer or company is prejudicial to the Developer's rights. When the Developer amends the Covenant, it must get approval from the unit owners unless it ensures that the amendment does not materially alter or change any unit owner's right to the use and enjoyment of their unit.

¶ 11. The Developer has amended the Covenant four times. In 2001, the Developer lowered the percentage of assessments the Association would levy on the golf course owner and changed the Association's voting structure. In 2004, an amendment allowed the Association to purchase utility infrastructure for $8.5 million. It acquired the $8.5 million through a loan that, if the

Association defaulted, would allow the mortgagee to "levy a special assessment against all Unit owners in such amounts as necessary to pay the Loan in full." Finally, in 2005, the Developer altered a prohibition against timeshares to allow them on certain parts of Geneva National.

¶ 12. The Developer's powers expire upon the conveyance by the Developer of eighty-five percent of the maximum number of residential units. The power to permit expansion does not expire, though no evidence shows that the Developer is contemplating expansion. The maximum number of units is determined from time to time pursuant to the provisions of applicable zoning laws, ordinances, use permits, amendments, and other government laws. The current maximum number of units is 1960. As of April 2007, the Developer has conveyed 1015 units, or approximately fifty-two percent of the maximum number. Therefore, to reach eighty-five percent, the Developer must convey 651 more units. The Developer expects that, based on current sales forecasts, it will reach the eighty-five percent trigger within the next five to ten years. No other term exists to transition the Developer's control; the Covenant does not set a total number of units nor a maximum amount of time.

¶ 13. Solowicz sued for declaratory judgment, alleging that Geneva National's governing structure granted the Developer too much control—an unreasonable amount of control that violated Wisconsin's Condominium Ownership Act, WIS. STAT. ch. 703. Solowicz appeared to argue that the Association and the Trust were mere figureheads because the Developer could unilaterally exercise its powers and perpetually control the majority of the Association's board through its own four votes and its power to remove or appoint any other

officer on the board. Solowicz implied that the Developer was using its superior position to control the community and assess unit owners without recourse, or as we interpret it, a "taxation without representation to infinity" argument. He listed numerous complaints regarding the Developer's actions, including an $850,000 gate that unit owners paid for but that allegedly benefited only the Developer's own real estate office, various amendments to the Covenant to suit its fancy, and, quite simply, composing the Covenant in such a way that it could do whatever it liked for however long it liked.

¶ 14.  As a solution, Solowicz sought a declaration from the circuit court that the Developer must relinquish control to the unit owners. Solowicz claimed that the Covenant is a condominium instrument and as such, WIS. STAT. ch. 703 dictates that the Developer's control should have ended years ago, either three or ten years from the start of the development. Anticipating the Developer's defense that Geneva National was a master-planned community and thus outside the confines of ch. 703, Solowicz argued that the Covenant was still subject to ch. 703 because it controlled the condominiums within Geneva National. Finally, Solowicz asserted that even if the Covenant was held to be outside ch. 703, it was nonetheless unreasonable, ambiguous and vague, and against public policy, and therefore void.

¶ 15.  The circuit court ruled for the Developer on the parties' cross motions for summary judgment, holding that the Covenant is not a condominium instrument nor otherwise subject to WIS. STAT. ch. 703. The court also held that the Covenant was clear and specific, and since the law informs that clear and specific restrictive covenants are not subject to a separate reasonableness

evaluation, the court went no further. Solowicz appeals, presenting the same arguments to this court that he raised before the circuit court. We review a motion for summary judgment de novo, applying the same standard as the circuit court. *Green Springs Farms v. Kersten*, 136 Wis. 2d 304, 314–15, 401 N.W.2d 816 (1987).

## APPLICATION OF WISCONSIN'S CONDOMINIUM LAW

¶ 16.   We first address Solowicz's argument that Geneva National's Restrictive Covenant violates Wisconsin's Condominium Ownership Act, WIS. STAT. ch. 703. As he did before the circuit court, he asserts that the Covenant is a condominium instrument. And he argues again that, even if the Covenant does not follow ch. 703's formal requirements because it was intended to refer to a master-planned community, ch. 703 still controls as far as the condominiums within the master-planned community are concerned.

### A.   Condominium Instruments

¶ 17.   Solowicz asserts that the Covenant is a condominium instrument because the Developer attached the Covenant to the individual condominium declarations. He reasons that WIS. STAT. ch. 703 applies to any condominium instrument and to all property with a duly executed condominium declaration. Therefore, he contends that ch. 703 must supersede any contradictory provisions in any document controlling the Geneva National property. According to Solowicz, since ch. 703 dictates that the Developer has only three years to develop the property or ten years if it is an

222

expandable condominium, and both time limits have long passed, the Developer must cede control.

¶ 18.  The Developer argues that the Covenant is exactly what it purports to be:  a restrictive covenant running with the land that controls Geneva National's development and infrastructure as a master-planned community, which has nothing to do with the day-to-day maintenance of the individual condominiums' common areas. It points out that Geneva National is not simply a collection of condominiums; in fact, major parts of the development are not designated as condominiums. Further, the Developer explains that WIS. STAT. ch. 703 requires documents to follow certain formalities before the property may come under ch. 703. On its face, the Developer notes, the Covenant conforms to no such prerequisites.

¶ 19.  In Wisconsin, WIS. STAT. ch. 703 governs only condominiums with a recorded condominium declaration or instrument. WIS. STAT. §§ 703.02(4), 703.03, 703.07, 703.30(2). To form a condominium, the instrument must contain the word "condominium" in its name and a "statement of the owner's intent" to subject the property to the condominium declaration established under this chapter. WIS. STAT. § 703.09(1)(a)-(b). These are just a sampling of the requirements a condominium developer must follow to establish a condominium, which if followed, subject it to ch. 703.

██

¶ 20.  The Covenant contains none of the above. It refers to condominiums only when it speaks to the Condominium Declaration and the parcels designated as condominiums within it. The only documents or "instruments" containing condominium in its name and specifying the Developer's intent to create a condominium are the Condominium Declaration and the

documents creating the individual condominiums. Therefore, the Covenant is not a condominium instrument subject to Wis. Stat. ch. 703.

## B. Master-Planned Communities

¶ 21. Solowicz also argues that even if the Covenant is not a condominium instrument, it is still a Wis. Stat. ch. 703 document because it is designed, in pertinent part, to control the condominiums lying within the Geneva National property. He posits that the Covenant creates an umbrella organization just like that authorized under Wis. Stat. § 703.155(7), and that organization controls the condominiums.

¶ 22. The Developer counters by explaining that Geneva National is a master-planned community, not a condominium venture, and points out what it considers to be the vast differences between condominiums and master-planned communities. The Developer explains that master-planned communities present a complex development method, distinct from condominiums, requiring the Developer to retain control so that it may react to varying market and government conditions in seeing its vision through and its investment secured.

¶ 23. We agree that master-planned communities are an entirely different type and level of development than condominiums. A condominium is "an apartment house, office building, or other multiple-unit complex, the units of which are individually owned, each owner receiving a recordable deed to the individual unit purchased, including the right to sell, mortgage, etc., that unit and sharing in joint ownership of any common grounds, passageways, etc." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 426 (2d ed. 1987). A master plan develops or improves "(land, a community,

a building complex, or the like) through a long-range plan that balances and harmonizes all elements." *Id.* at 1184. And a community is a locality inhabited by a group whose members "share government, and often have a common cultural and historical heritage." *Id.* at 414. Taken together, a master-planned community is a private quasi-town that may include different types of homes (even condominiums), commercial property, private streets and parks, and other recreational facilities like golf courses, and is designed to attract a certain kind of person. Thus, there is a stark difference between condominiums and master-planned communities.

¶ 24. Geneva National fits the definition of a master-planned community and its scope goes beyond a condominium venture. Geneva National has a master plan (the Restrictive Covenant) that guides the development of 1600 acres of land into the Developer's vision—a distinct golf and leisure community. And the Covenant's restrictions, preserving the natural environment and maintaining a cohesive community through architectural standards, in concert with its golf courses and other leisure offerings, create this community. The community's inhabitants have a common interest in those offerings, and potential buyers who dislike the balance of amenities and restrictions, need not purchase property within the community.

¶ 25. Still, Solowicz persists, citing three cases from other jurisdictions that, he avers, use condominium law to limit a developer's control over master-planned communities. He contends that these cases involved restrictive covenants creating governing schemes similar to Geneva National.

¶ 26. First Solowicz cites *Fox v. Kings Grant Maintenance Ass'n, Inc.*, 770 A.2d 707 (N.J. 2001), holding that an umbrella association controlled by nonunit owners could not irrevocably manage the day-to-day maintenance of the common areas of its individual condominium communities. *Id.* at 709. Kings Grant was a master-planned community[5] with fifteen sectionalized communities—six townhouses and nine condominium communities. *Id.* at 709–10. The community's umbrella association had the full responsibility for day-to-day maintenance of *"all common property,"* including common elements of the individual condominiums. *Id.* at 711. The individual condominium associations had to irrevocably delegate most of their power over their common elements to the umbrella association. *Id.* at 711–12.

¶ 27. Solowicz asserts that *Fox* stands for the proposition that a developer cannot have lingering control over a condominium by delegating powers to an umbrella association. However, he leaves out one significant detail about the court's rationale. The *Fox* court distinguished between the power to exercise control over common elements of an individual condominium community as opposed to the power to develop the entire master-planned community. *Id.* at 709, 719. The *Fox* court held that the umbrella organization could manage "property intended for the common and beneficial use of unit owners of several separate condominium associations, such as common roadways, common open

---

[5] *Fox v. Kings Grant Maintenance Ass'n, Inc.*, 770 A. 2d 707, 710 (N.J. 2001), describes Kings Grant as a "planned-unit development;" but we consider it to be the same as a "master planned community" for the purpose of this issue.

space, and common recreational facilities," but could not manage the common elements of an individual condominium. *Id.* at 709.

¶ 28.  With that distinction in mind, *Fox* actually supports the Developer in this case, not Solowicz. Here, the umbrella association manages only what *Fox* says it can manage—the "common roadways, common open space, and common recreational facilities." *See id.* And the condominium association, not the umbrella association, manages the common elements of each individual condominium. Thus, *Fox* is no help to Solowicz.

¶ 29.  The second case is *Ainslie at Century Village Condominium Ass'n, Inc. v. Levy*, 626 So. 2d 229 (Fla. Dist. Ct. App. 1993). The court there held that unit owners in a community with sixteen condominiums had the right to use condominium law to void a contract and lease between the developer and a management firm. *Id.* at 231–32. The developer contracted with a management firm to provide maintenance and lease the condominium's common areas and "community services and facilities." *Id.* at 230. These services included the complete operation and maintenance of the individual condominium property. *Id.* at 230–31. Purchasers of a condominium in Century Village were required to separately sign this management contract and lease. *Id.* The court held that this contract usurped the condominium associations' power to operate the condominiums, therefore subjecting the contract to condominium law. *Id.* Thus, the unit owners could use provisions in the condominium law to cancel the contract. *Id.* at 232.

¶ 30.  Here, the Developer does not have a lease or contract to provide maintenance for the individual condominiums' common areas. Once again, the Covenant in this case does not control the individual condominium property, only the community property.

227

And moreover, *Ainslie,* as far as we can tell, involved only condominiums, albeit multiple condominiums. We note that the *Ainslie* court did not refer to any other type of residential, commercial or other property type besides condominiums. *See id.* at 230. Therefore, *Ainslie* is inapplicable.

¶ 31. Finally, *Brandon Farms Property Owners Ass'n, Inc. v. Brandon Farms Condominium Ass'n, Inc.,* 852 A.2d 132 (N.J. 2004), held that the developer cannot require the condominium association to be responsible for past-due assessments owed to an umbrella organization. *Id.* at 133–34. The court described Brandon Farms as a community of single-family homes, townhouses, and condominiums. *Id.* at 134. The restrictive covenant governed both a condominium association and an umbrella association. *Id.* And the covenant provided that the condominium association, instead of individual unit owners, was liable for the umbrella association's assessments. *Id.* But even though the *Brandon Farms* court did refer to condominium law to void part of the restrictive covenant in this planned community, it is still crystal clear that the developer was imposing a duty on the condominium association above and beyond the association's historical role of governing the common areas.

¶ 32. Like *Fox* and *Ainslie,* the court in *Brandon Farms* evaluated the lawfulness of restrictive covenants as they applied to the individual condominium association's duties or its common areas. Here, the umbrella association assesses the unit owners directly; it does not pass the assessments through the condominium association. And our search of the record did not turn up any facts showing that the Developer meddled with the governance of the individual condominiums or the associated duties of the Condominium Master Association.

¶ 33. All of Solowicz's complaints relate to how the community as a whole—the master plan—is being developed; he has not registered any complaints that the Developer is meddling in individual condominium affairs. The assessments that Solowicz complains he is beholden to have nothing to do with the individual condominiums' common areas and everything to do with paying his share of the cost of improving the community as a whole, something he agreed to do when he purchased his unit. The cases he cites do not support him. We conclude that, just because a master-planned community has condominiums as part of the plan, the overriding covenant is not subject to WIS. STAT. ch. 703.

## C. WISCONSIN STAT. ch. 703's Application to Master-Planned Communities

¶ 34. While Solowicz's arguments are confined to assertions that the Restrictive Covenant is subject to WIS. STAT. ch. 703, the begging question remains: Was ch. 703 promulgated with the intent to include master-planned communities? The answer must be "no." First, we recite our standard of review. "[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." *State ex rel. Kalal v. Circuit Ct. for Dane County*, 2004 WI 58, ¶ 44, 271 Wis. 2d. 633, 681 N.W.2d 110. We first look at the plain language of the statute, taking into consideration the context in which the provision under consideration is used. *Id.,* ¶¶ 45–46. "Statutory language is given its common, ordinary, and accepted meaning." *Id.*, ¶ 45. The scope, history and purpose of the statute are also "relevant to a plain-meaning interpretation of an unambiguous statute as long as [they] are ascertainable from the text and

structure of the statute itself." *Id.*, ¶ 48. We may consult extrinsic sources "to confirm or verify a plain-meaning interpretation." *Id.*, ¶ 51.

¶ 35.  Reviewing WIS. STAT. ch. 703, it unambiguously provides no reference whatsoever to master-planned communities. So, the plain meaning of the chapter is that it simply does not contemplate such communities.

¶ 36.  A review of extrinsic sources confirms the plain meaning, in that they suggest WIS. STAT. ch. 703 never contemplated master-planned communities. Since the chapter's creation in 1978, the legislature has not changed the time limit relating to the relinquishment of a developer's control over condominiums. *See* 1997 WIS. ACT 333; 2003 WIS. ACT 283 § 24; 1997 A.B. 537; 1977 S.B. 383, ch. 407. The year 1978 was well before the idea of master-planned communities took off. It is hardly conceivable that the legislature, as it existed in 1978, intended for master-planned communities to come under ch. 703. In fact, extrinsic history suggests the opposite. As explained by the drafting committee chair to the Uniform Common Interest Ownership Act,[6] Carl Lisman:[7]

---

[6] The Uniform Common Interest Ownership Act creates a law to govern all common-interest communities. The National Conference of Commissioners on Uniform State Laws originally drafted it in 1982 and created a new version in 1994. A common-interest community "means real estate with respect to which a person, by virtue of his ownership of a unit, is obligated to pay for real estate taxes, insurance premiums, maintenance, or improvement of other real estate described in a declaration." UCIOA § 1–103(7) (1994). This includes both condominiums and master-planned communities.

[7] Carl Lisman is the Treasurer of National Conference of Commissioners on Uniform State Laws and chaired the drafting

> Times have changed [since 1976] and . . . more than half the homes started in the United States are homes that will end up in Common [Interest] Communities and this gets bigger and bigger everyday and it needs more and more attention on a legislation level.
>
> . . . .
>
> We put [a seven year time limit on the Developer's control] in the original [1975] Condominium Act and decided after a while that was a really bad idea. Every project is of a different size and complexity. They all change so we finally concluded that the right answer was to say let the developer choose the time period and as long as the developer discloses it, then buyers will know, and they will make a meaningful decision.

As Lisman said, times have changed. The vision of condominium development in 1978 did not countenance master-planned communities like those that are sprouting today.[8]

¶ 37. In verifying the plain meaning of the statute, it is also helpful to consider the purpose of the

committee for the 1994 revisions to the Uniform Common Interest Ownership Act. He is also a shareholder in Lisman, Webster, Kirkpatrick & Leckerling, P.C. in Burlington, VT. These comments were made at a January 23, 2006 speech to the Maryland Department of Housing and Community Development Task Force on Common Ownership Communities and are available at http://www.ahrc.com/new/index.php/src/news/sub/article/action/ShowMedia/id/2929 (last visited Jan. 29, 2009).

[8] We recognize that the Wisconsin attorney general issued an advisory memorandum concluding that the Covenant is subject to the Wisconsin Condominium Ownership Act, ch. 703. The attorney general termed Geneva National a community of "expandable" condominiums and the Covenant a condominium instrument. Though our analysis benefited from this opinion, we disagree with the attorney general's conclusion. As the circuit court recognized, the attorney general did not have any

chapter as it relates to master planned communities. Here, the Wisconsin Realtor's Association's amicus brief is helpful. As the Realtor's Association notes, under Wisconsin's condominium law, the condominium developer has up to three years (or ten years for expandable condominiums), to control development after recording the condominium declaration. WIS. STAT. §§ 703.15(2)(c), 703.26(2)(d). Section 703.15(2)(c)1.c. also requires the developer to turn over control thirty days after the conveyance of seventy-five percent of the units. Given this timetable, the Realtor's Association rhetorically asks the following questions:   In a community with fifteen proposed nonexpandable condominiums, where one condominium is brought from creation to one hundred (or even seventy-five) percent conveyance each year, when would the developer have to turn over control? After the sell-out of units in the first condominium or the last? Or would it be three years from the recording of the first individual condominium declaration or the last? Like the Realtor's Association, we cannot imagine an entire master-planned community, really a quasi-town, being built and sold in three or ten years. Simply put, master-planned communities would likely cease to exist if limited by WIS. STAT. ch. 703. We conclude that master-planned communities are not part of the purpose behind ch. 703's promulgation.

## REASONABLENESS
## OF THE RESTRICTIVE COVENANT

¶ 38.   Solowicz's next argument is that Article IX of the Covenant is void because the timeframe for the Developer's control is unreasonable, ambiguous and

of the underlying legal documentation necessary to make a fully informed opinion, such as the Covenant and Condominium Declaration.

vague, and against public policy. First, Solowicz asserts that even when a restrictive covenant is clear and specific, it must be reasonable. He claims that all of his complaints about what the Developer can control and how the Developer has acted, by purchasing an $850,000 gate and amending the Covenant, show that the Developer's control is patently unreasonable. He asserts that the Developer's actions were for its own self-interest, not for the benefit of the unit owners or the community. And again, he refers to WIS. STAT. ch. 703, postulating that seventeen years, with no end in sight, is unreasonable compared to the three or ten year limit in ch. 703.

¶ 39.   Solowicz also argues that the Covenant fails because it is not clear and specific. He asserts that Article IX must state the maximum number of allowable units and clearly define the term "convey." In his view, the Covenant is designed so that the Developer may expand its construction plan in such a way that it never reaches the eighty-five percent threshold. If the court does not intervene, Solowicz contends, then the Developer will never have to turn over control and this could last into infinity. Solowicz wants Article IX excised, which would transfer the Developer's control to the Association and Trust. If that occurs, then, he thinks, the unit owners will finally have a say in how the land is governed and how their money is spent.

¶ 40.   The Developer responds that under *Pertzsch v. Upper Oconomowoc Lake Ass'n*, 2001 WI App 232, ¶ 10 and n.3, 248 Wis. 2d 219, 635 N.W.2d 829, this court's inquiry must end if we conclude that the Covenant is clear and specific, which, it asserts, the Covenant is. The Developer explains that in reading the Covenant, it is easy for the reasonable person to calculate the specific number of units it must convey to reach

eighty-five percent. The Developer contends that the Covenant need not state a specific maximum for it to be clear and specific.

■■

¶ 41.   The interpretation of a restrictive covenant is a question of law, as is the determination of whether the language of a restrictive covenant is ambiguous. *Zinda v. Krause*, 191 Wis. 2d 154, 165, 528 N.W.2d 55 (Ct. App. 1995). Courts will not enforce restrictions on the free use of land when they are ambiguous. *See Crowley v. Knapp*, 94 Wis. 2d 421, 438, 288 N.W.2d 815 (1980). If restrictions, such as restrictive covenants, contain clear and specific guidelines for their application, courts need not determine if they are reasonable. *Pertzsch*, 248 Wis. 2d 219, ¶ 10 and n.3. The language in a restrictive covenant is unclear if it is susceptible to more than one reasonable meaning. *See Borchardt v. Wilk*, 156 Wis. 2d 420, 427, 456 N.W.2d 653 (Ct. App. 1990).

■■ ■■

¶ 42.   Courts use the rules of contract interpretation to ascertain the meaning of restrictive covenants. *See Siler v. Read Inv. Co.*, 273 Wis. 255, 261, 77 N.W.2d 504 (1956).

> The interpretation must be upon the entire instrument and not upon disjointed or particular parts of it. It must be borne in mind that the office of judicial construction is not to make a contract conform to the wishes of a party manifesting itself after the agreement has been made, but to determine what was agreed and set forth in the instrument itself.

*Id.* When the meaning of a contract can be determined from its face with "reasonable certainty," a court need not consider evidence beyond the contract and should enforce the clear language itself. *Central Auto Co. v. Reichert*, 87 Wis. 2d 9, 19, 273 N.W.2d 360 (1978).

¶ 43. Article IX states that the Developer's control will end before the Developer conveys eighty-five percent of the maximum number of units. The maximum number of units is calculated "from time to time" based on zoning and other applicable government ordinances and restrictions. The maximum number of units at the start of the project was 1900, and now it has increased sixty units, or about three percent.[9] Though the Developer has explained the term "convey" differently, every explanation ultimately states that a conveyance occurs when the Developer sells or "conveys" a parcel to an owner or to a third-party developer who has platted the parcel.[10] These terms are unambiguous and provide a clear and

[9] The original plan in 1989 called for 1900 residential units. In 1993, though, the Developer increased the density by 200 units, raising the maximum number of units to 2100 units. In 1999, the Developer expanded the golf courses, reducing the maximum number of units to 1960. The maximum number of units remains at 1960.

[10] In 2006, the Developer explained that a "conveyance" required a Certificate of Occupancy or that the property be placed on Geneva National's assessment roles. In 2007, the Developer responded to an interrogatory by explaining that "conveyed by Declarant" requires the Developer to sell a parcel to a third party developer who has platted the parcel, or to an individual third party purchaser. This makes sense when one remembers that the entire property is not already platted; instead, when the Developer obtained its Conditional Use Permit it designated parcels for a particular purpose. So when the Developer sells a parcel to a third party developer, that developer must then seek a building permit to develop a certain number of units according to its plat. *See* Wis. Stat. §§ 236.03, 703.11. Until the third party developer plats the parcel, the density of that particular parcel is unknown. Thus, until the third party developer plats the parcel, the Developer cannot answer how many units it conveyed to the third party developer.

specific method to determine when the Developer will turn over control.

¶ 44. Though, under *Pertzsch*, we could end our analysis here, the gravity of what we call Solowicz's "taxation without representation into infinity" claim leads us to examine the Covenant's reasonableness by comparing the timetable in Article IX with the timetable and policy of the 1994 Uniform Common Interest Ownership Act. We also find it important to reiterate the special needs of master-planned communities to allow developers to turn their vision into a community.

¶ 45. Under the Uniform Act, if a master-planned community has at least 500 residential units on at least 500 acres, then the declaration, or restrictive covenant, need not state a maximum number of units. UCIOA §§ 2–123(a)-(c), 2–105(a)(3)-(14) (1994). Instead, Section 3–103(d)(i)-(iii) explains that the latest a developer can turn over control is the earlier of sixty days after the conveyance of seventy-five percent of possible units or two years after the developer ceased to add new units or offer units for sale. The developer, of course, must abide by any timeline in the declaration or other recorded instrument if that timeline is shorter than § 3–103(d)(i)-(iii). *See* UCIOA § 2–123(g).

¶ 46. The policy behind the Uniform Act's timeline explains why an eight-five percent trigger is reasonable. The RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 6.19(2) (1998)[11] states that turnover should occur "[a]fter the time reasonably necessary to protect [the developer's] interests in completing and

---

[11] The National Conference of Commissioners on Uniform State Laws promulgated both the RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES ch. 6 (1998) and the Uniform Common Interest Ownership Act.

marketing the project." This reflects one of the Uniform Act's principle goals—"to maximize the flexibility available to a developer seeking to adjust the size and mix of a project to the demands of the marketplace, both before and after creation." UCIOA § 1–103 cmt. 15. The Uniform Act recognizes that if the developer has to relinquish control before fully developing the land, then the unit owners could dictate further development, potentially destroying the developer's investment along with the property values in the community. *Id.* And, as stated earlier, the Uniform Act's drafting committee "concluded that the right answer was to say let the developer choose the time period and as long as the developer discloses it, then buyers will know, and they will make a meaningful decision."[12] Thus, we cannot say that Article IX's timetable is arbitrary, because it discloses a clear and specific formula to allow buyers to meaningfully decide whether to enter into this contract.

¶ 47.　But Solowicz asserts that Article IX is also unreasonable because it does not fix an ending point on the Developer's power to expand Geneva National. In his view, the Developer can keep expanding the number of units on the property so that it will never obtain eighty-five percent conveyance. However, we agree with the circuit court that Solowicz has not presented any evidence that the Developer intends to expand, is "over-developing," or is deviating from the original intent or development plan in the Covenant. Indeed, it is in the Developer's interest to maintain its vision in the community by balancing the level of development

---

[12] Carl Lisman, Treasurer, NCCUSL, Address at the MD Dept. of Hous. and Cmty. Dev. Task Force on Common Ownership Communities (Jan. 23, 2006) (transcript available at http://www.ahrc.com/new/index.php/src/news/sub/article/action/ShowMedia/id/2929, last visited Oct. 21, 2008).

with the preservation of open space. And it would be against the Developer's own interest to intentionally fail to sell the units and land it owns. Therefore we cannot find that the Covenant is unreasonable as a matter of law.

¶ 48.   This case would be different if the Developer had promised Solowicz that the Association's fees would be less than a certain dollar amount; if the Developer had reached the eighty-five percent figure but held onto control; or if the Developer continued its control years after development and new home sales stopped, even if eighty-five percent of the maximum number of units had not yet been sold. But here, the Developer did not promise Solowicz what its assessments would be, and the Developer is still building and selling single- and multi-family houses and condominiums to reach the eighty-five percent figure.

¶ 49.   Of great importance to the drafters of the Uniform Act was that buyers be given full disclosure of the rights and interests of the Developer of a master-planned community. Here, in the circuit court's words, Solowicz bought-in with his "eyes wide open." If Solowicz is now opposed to how the Developer maintains this unique community, if he now dislikes the Developer's power to amend the Covenant and make capitol improvements so as to realize the fruits of its investment, then his remedy is to sell his condominium to end the contract. We will not void an entire method of community development because a few condominium owners have formed their own ideas about what the future of planned communities should be. Nor will we make a public policy decision to limit this type of development when the Covenant complies with contract principles and provides clear and specific standards that follow the policy of the Uniform Act and the Restatement.

Therefore, we affirm the circuit court's grant of summary judgment for the Developer.

*By the Court.*—Order affirmed.