770 A.2d 707

STEPHEN G. FOX, PLAINTIFF–APPELLANT, AND GAY P. FOX, WEB–OCTOBER SENDAYDIEGO, JOSEPH AND ARLENE CO-LACHE, STEVEN AND JUDITH GEZCO, LYNNE DANT, SU-SAN SETTERBERG, LAWRENCE M. AND JUDITH C. DOAN, STEVEN RAYMOND, ROY A. AND JOAN E. WILLAUER, JAMES AND WILHELMINA LARUSSO, LIONEL HENRY AND

JOANNE AMANTE, CHARLES AND DONNA PEART, ARTHUR AND SALLY MANGANO, LAWRENCE G. AND ELAINE LEAF, BARRY AND SUSAN SCHULNICK, WILLIAM AND MILDRED Z. SMITH, CHARLES FIELD, EDWARD AND CAROLYN MANTO, BARRY AND BETH SOHOL, WAYNE AND ELIZABETH CROCE, HAROLD AND LISA GILHAM, SUSAN FUDCIA, MICHAEL APPLEBAUM, DIANE L. FABII, ANDREW FLITTER, MARK JAMES, JOHN AND LYNNE MOORE, JOSEPH P. AND DEBRA JAY, LOUIS AND WINKI GAEV, RAYMOND J. AND ADELE F. MANNELLA, HELENA BERGEN, MILTON E. AND PATRICIA BURDSALL, ROBERT AND SUZANNE UITTENBOGAARD, VICTORIA GORMAN, MAXINE WOLF, KATHLEEN M. QUINN, EDWARD AND SANDEE GOLDEN, JERRY A. AND JEANETTE BRUNETTI, ISADORE AND DORIS MARKS, GEORGE M. AND CAROL B. PATTERSON, WILLIAM AND SHIRLEY LOVE, RICHARD C. AND MARYANN T. EMERY, JOHN MEEHAN, ROSEMARY STAFFORD, SAMUEL A. AND EDNA M. BATES, ROBERT E. AND LOUISE D. GOEHRING AND PHILIP D. AND DELORES G. BRENNAN, PLAINTIFFS, v. KINGS GRANT MAINTENANCE ASSOCIATION, INC., PATRICIA D. CASASSA, MARVIN COE, BEVERLY COX, FRANCIS WHEELER, THOMAS DAGNEY AND TOWNSHIP OF EVESHAM, DEFENDANTS–RESPONDENTS.

Argued January 16, 2001—Decided May 17, 2001.

*Stephen G. Fox*, argued the cause, *pro se*.

*Justin T. Loughry*, argued the cause for respondents, Kings Grant Maintenance Association, Inc., Patricia D. Casassa, Marvin Coe, Beverly Cox, Francis Wheeler and Thomas Dagney, (*Loughry and Lindsay*, attorneys).

*Stacy L. Moore, Jr.*, argued the cause for respondent, Township of Evesham, (*Parker, McCay & Criscuolo*, attorneys).

The opinion of the Court was delivered by

STEIN, J.

■ The primary issue presented by this appeal is whether the Condominium Act, *N.J.S.A.* 46:8B–1 to –38, permits a municipal planning board to require a condominium association irrevocably to delegate its powers over its unit owners' common elements to an umbrella association controlled by non-unit owners. The Appellate Division held that the Condominium Act allowed a municipality to mandate such a governance scheme. We granted certification, 165 *N.J.* 489, 758 *A.2d* 648 (2000), and now reverse the judgment of the Appellate Division. We hold that the Condominium Act prohibits a municipality from requiring unit owners in one sectionalized community to delegate their governance rights over their community's common elements to unit owners in other sectionalized communities by the use of an umbrella association. In our view, the Act is better understood to authorize an umbrella association to serve only the limited function of coordinating and managing property intended for the common and beneficial use of unit owners of several separate condominium associations, such as common roadways, common open space, and common recreational facilities.

I

This appeal involves forty-six plaintiffs who own condominiums in the Waters Edge condominium community (Waters Edge), one of fifteen distinct communities comprising the Kings Grant Planned Unit Development (Kings Grant). Kings Grant is a large development located in Evesham Township and Medford Township, Burlington County, New Jersey. Kings Grant spans approximately 1,800 acres and consists of fifteen sectionalized communities including six townhouse and nine condominium communities.

There are a total of 1,447 individually owned units, and Waters Edge represents sixty-seven of those units.

The Evesham Township Planning Board (Planning Board) originally approved the initial Kings Grant project in 1968 and 1971. In 1983 Kings Grant Equities, Inc., the owner of the remaining undeveloped land, came before the Planning Board to request a revised preliminary approval to authorize the additional development of Kings Grant. The revised proposal involved the construction of sectionalized communities including single-family homes, townhouses, and condominiums, and the development of community facilities for all Kings Grant unit owners such as bicycle trails, recreational facilities, commercial centers, and open space.

After eight public hearings on the proposal, the Planning Board adopted Resolution 83–45 (Resolution) on September 1, 1983. In the twenty-four page Resolution, the Planning Board gave preliminary approval to the proposal that included the development of separate communities with common covenants and restrictions bearing on traffic, quality-of-life, environmental and safety issues. The Resolution conditioned the future development of Kings Grant on express "Findings of Fact" and "Specific Conditions." In Finding of Fact eleven, the Planning Board called for the establishment of an umbrella maintenance association, as follows:

*HOMEOWNERS ASSOCIATION*

In order to ensure the professional management of the common properties in Kings Grant, and in order to promote the responsibilities and economies which are necessary in a development as large as Kings Grant, an umbrella organization is needed to coordinate the maintenance and improvement of all common private property. The "umbrella" association should have the power to mandate and collect fees in order to preserve its effectiveness for the maintenance and control of the common improvements. However, the liability for fees should be allocated in such a way that condominiums, cooperatives, and other sections with common structural elements will pay for the costs attributable to the operation, repair and maintenance of the improvements in their particular section.

In Specific Condition eleven, the Planning Board explained that the umbrella association would be

a mandatory dues paying association *for the coordination and control of privately owned streets, walkways, recreation, and other facilities limited to all or some of*

*the residents of Kings Grant.* The purpose of the association will be to provide overall management and control of the Kings Grant Planned Unit Development. [(Emphasis added).]

Kings Grant Equities consented to the condition imposed by the Planning Board mandating formation of the umbrella association. To comply with the Planning Board's Resolution, Kings Grant Equities filed a Declaration on April 24, 1985, to establish the Kings Grant Maintenance Association, Inc. (KGMA). The Declaration explained that as a condition of granting all municipal approvals for the further development of Kings Grant, the Planning Board required Kings Grant Equities to establish a management system in which a single entity is fully responsible for "the maintenance, management, preservation, administration, upkeep and care of *all common property.*" (Emphasis added.) The Declaration defined common property as follows:

[A]ll property intended for common and beneficial use of Unit Owners within any Section of Kings Grant regardless of the form of ownership. Common property shall also mean and refer to all lands, buildings, improvements and facilities *including, without limitation, common elements as that term is defined in N.J.S.A. 46:8B–1,* property owned by Community Associations and property owned by the owners of record of more than one Unit as tenants-in-common with no right of partition.[1]

[(Emphasis added).]

The Declaration stated that every sub-association within Kings Grant shall be deemed to have "irrevocably delegated" to KGMA all of its powers and duties for the maintenance, preservation, administration and operation of common property.

According to the Public Offering Statement filed by Kings Grant Equities, each of the Kings Grant communities would be required to form sub-associations to provide for the maintenance

---

[1] That definition of common property is far more expansive than the definition contained in the Evesham Township Planning Board's Resolution. According to Specific Condition eleven, the Planning Board's approval of the future development of Kings Grant was conditioned on the creation of "a mandatory dues paying association *for the coordination and control of privately owned streets, walkways, recreation, and other facilities limited to all or some of the residents of Kings Grant.*" (Emphasis added.)

and administration of common property within the specific community. However, those sub-associations were required to delegate "most of their powers and responsibilities [for common property] to the Maintenance Association." The Public Offering Statement provided that the umbrella or maintenance association would possess "the power and the obligation to enforce any covenants and restrictions contained in any Declarations, Master Deeds, Certificates of Incorporation or By–Laws of each Community Association."

Article II of the Declaration, in conjunction with KGMA's Bylaws, sets forth the process for the unit owners' participation in the maintenance association and for representation on the KGMA Board of Trustees. According to those documents, each unit owner in Kings Grant is a "beneficial member" of KGMA. However, individual unit owners cannot participate directly in the management of KGMA. Instead, each one of the fifteen communities in Kings Grant elects one delegate to represent its interests. If a community has more than fifty units, that community receives one additional delegate for each fifty units in excess of the first fifty. Because Waters Edge has only sixty-seven units, it is represented by one delegate. Comparatively, a community with 110 units, would be represented by two delegates. Once chosen, each delegate is given a number of votes equal to the number of units within their representative community. Because Waters Edge has sixty-seven units, the elected Waters Edge delegate has sixty-seven votes to cast. A majority of the votes cast is necessary to approve or disapprove any measure.

KGMA is governed by a five-member Board of Trustees elected by the KGMA delegates. The Board has extensive powers and is responsible for managing KGMA's "property, affairs and business." Some of those powers include providing for the maintenance of the common property, employing persons to repair and maintain the common property, enforcing the obligations of beneficial members by levying fines against them for various violations, bringing and defending legal actions by or against beneficial

members or any other party as necessary, managing the fiscal affairs of KGMA, providing for KGMA's required insurance coverage and investing and reinvesting KGMA's monies.

In April 1994, Waters Edge was created and made subject to the Condominium Act by a Master Deed filed in Burlington County. Waters Edge was the last of the fifteen communities in Kings Grant to be developed. The Waters Edge Master Deed established a Waters Edge condominium association, but declared that "certain powers and duties" of the Waters Edge community are "irrevocably delegated" to KGMA's Board of Trustees. Likewise, the Waters Edge Bylaws delegated many of the sub-association's powers and duties, including the day-to-day operation and maintenance of its buildings and common elements, to KGMA. At oral argument, Stephen G. Fox, counsel for plaintiffs, represented that KGMA exercised authority over all aspects of the management of Waters Edge, including, "tell[ing] us how much money we are going to spend each year to take care of our property. They tell us how to pay that money. They tell us how that money is going to be used. Are we going to paint our property this year or are we going to paint it next year. What color are we going to paint our property. They get to tell us everything."

In 1997 a number of Waters Edge unit owners objected to KGMA's interference with the Waters Edge sub-association's affairs. One of the objections concerned the KGMA Board of Trustees' participation in Waters Edge's annual membership meeting. Consequently, in January 1998, forty-six Waters Edge unit owners filed a five-count complaint against defendants KGMA, its project manager, and members of its Board of Trustees (collectively referred to as KGMA). Both plaintiffs and KGMA filed motions for partial summary judgment. KGMA filed a cross-claim against plaintiffs, seeking authority to administer and control Waters Edge's elections. The trial court granted partial summary judgment in favor of KGMA, upholding the authority, validity and constitutionality of KGMA as an umbrella association with the power to maintain and manage all of the

common property within Kings Grant. However, the court also granted partial summary judgment to plaintiffs, finding that Waters Edge did not delegate to KGMA the power to control Waters Edge's membership meetings and elections. Plaintiffs appealed, and KGMA filed a separate appeal from the order granting partial summary judgment to Waters Edge. The Appellate Division panel consolidated the appeals and affirmed both judgments.

## II

### A

The Condominium Act was adopted in 1970 to provide for the creation and regulation of condominiums. *N.J.S.A.* 46:8B-1 to -38. In enacting the law, the New Jersey Legislature recognized a new form of real property ownership. *Siller v. Hartz Mountain Assoc.,* 93 *N.J.* 370, 375, 461 *A.*2d 568, *cert. denied,* 464 *U.S.* 961, 104 *S.Ct.* 395, 78 *L.Ed.*2d 337 (1983). To create that form of property ownership, the Act requires the developer to execute and file a master deed describing the land, identifying the units, defining the common elements, and providing for an association of unit owners. *N.J.S.A.* 46:8B-9.

A condominium unit is a separate parcel of real property that the unit owner may deal with "in the same manner as is otherwise permitted by law for any other parcel of real property." *N.J.S.A.* 46:8B-4. However, condominium ownership is distinct from other forms of property ownership because, when an individual purchases a condominium unit, he or she simultaneously acquires a proportionate undivided interest in the community's common elements. *N.J.S.A.* 46:8B-6. Common elements are defined as follows:

(i) the land described in the master deed;

(ii) as to any improvement, the foundations, structural and bearing parts, supports, main walls, roofs, basements, halls, corridors, lobbies, stairways, elevators, entrances, exits and other means of access, excluding any specifically reserved or limited to a particular unit or group of units;

(iii) yards, gardens, walkways, parking areas and driveways, excluding any specifically reserved or limited to a particular unit or group of units;

(iv) portions of the land or any improvement or appurtenance reserved exclusively for the management, operation or maintenance of the common elements or of the condominium property;

(v) installation of all central services and utilities;

(vi) all apparatus and installations existing or intended for common use;

(vii) all other elements of any improvement necessary or convenient to the existence, management, operation, maintenance and safety of the condominium property or normally in common use; and

(viii) such other elements and facilities as are designated in the master deed as common elements.

[*N.J.S.A.* 46:8B–3(d).]

■ Because an individual who purchases a condominium unit receives a proportionate undivided interest in the condominium community's common elements the control of common elements is indivisible, and the right of any unit owner to use the common elements is a right in common with all other unit owners. The Act states that "[t]he right of any unit owner to the use of the common elements shall be a right in common with all other unit owners ... to use such common elements in accordance with the reasonable purposes for which they are intended without encroaching upon the lawful rights of the other unit owners." *N.J.S.A.* 46:8B–6. The result is that the unit owner has a fee simple title to and enjoys exclusive ownership of his or her individual unit while retaining an undivided interest as a tenant in common in the facilities used by all of the other unit owners. *Siller, supra,* 93 *N.J.* at 375, 461 *A.*2d 568.

■ That each individual unit owner has an ownership interest in the condominium community's common elements means that the unit owner may use the common areas and facilities only in accordance with the purpose for which they were intended, without hindering or encroaching upon the rights of other unit owners. 15A *Am.Jur.2d Condominiums and Cooperative Apartments* § 32 (2000). Accordingly, "although a declaration may reflect a clear intent that a board of managers has the broad authority to manage and administer the property, including the common ele-

ments and limited common elements, a board cannot grant an individual unit owner the exclusive use of any part of the common elements without the required vote of all unit owners." *Ibid.* Thus, in a condominium, the common elements are not subject to partition and "any purported conveyance [or] encumbrance . . . of an undivided interest in the common elements made without the unit to which that interest is allocated is void." See *Unif. Common Interest Ownership Act* § 2–107(f), 7 *U.L.A.* 530 (1994).

The Condominium Act also provides for the creation of a condominium association, and mandates that that association, *"shall be responsible for the administration and management of the condominium and condominium property, including but not limited to the conduct of all activities of common interest to the unit owners." N.J.S.A.* 46:8B–12 (emphasis added). The association is charged with various duties, including the maintenance of the common elements and the assessment and collection of funds for common expenses. *N.J.S.A.* 46:8B–14. The Act also makes clear that when seventy-five percent of the units have been purchased, only the unit owners can elect board members of the association. *N.J.S.A.* 46:8B–12.1(a). Thus, the statutory scheme is to vest ultimate responsibility for the management of common elements in the unit owners of each condominium. In *Thanasoulis v. Winston Towers 200 Ass'n,* 110 *N.J.* 650, 656, 542 *A.*2d 900 (1988), we described the unique features of a condominium association, and explained that

> [a]n association is comprised exclusively of the unit owners who, through their individual deeds, automatically become members. In essence, an association is responsible for the governance of the common areas and facilities used by the owners of the condominium units. It is a representative body that acts on behalf of the unit owners. Its powers derive from its by-laws, the master deed, and applicable statutory provisions . . . *The most significant responsibility of an association is the management and maintenance of the common areas of the condominium complex.*
>
> [*Id.* at 656–57, 542 *A.*2d 900 (emphasis added).]

The Condominium Act also requires the association to act on behalf of its unit owners and gives primary responsibility to the association to protect those interests. We discussed that delega-

tion of authority in *Siller, supra,* 93 *N.J.* at 380, 461 *A.*2d 568, where we held that the association has the exclusive right to sue a party "to protect the rights and interests of the unit owners in the common elements." *Ibid.*

The condominium association carries out its functions through its elected officers and governing board. As unit owners become the majority of those who own units in the condominium community, the Act provides for their greater representation on the board. As a result, the Act phases out the developer's representation on the association's governing board and prevents a developer from having lingering control over an association. See *N.J.S.A.* 46:8B–12.1. For example, when unit owners own twenty-five percent or more of the units, unit owners are entitled to elect not less than twenty-five percent of the members of the governing board. Upon the conveyance of fifty percent of the units, unit owners are to elect not less than forty percent of the members of the board. Finally, after the conveyance of seventy-five percent of the units in a condominium community, unit owners are to elect all of the members of the governing board. Once unit owners are in the position to elect a majority of the board members, "the developer shall relinquish control of the association and the unit owners shall accept control." *N.J.S.A.* 46:8B–12.1(d).

The Act also prevents a developer from indirectly exercising control over an association by prohibiting a developer from entering into long-term service and management contracts prior to the unit owners' electing the majority of association board members. The Act states that "[a]ny management, employment, service or maintenance contract or contract for the supply of equipment or material which is directly or indirectly made by or on behalf of the association, prior to the unit owners having elected at least 75% of the members of the governing board ... shall not be entered into for a period in excess of two years." *N.J.S.A.* 46:8B–12.2. The Act provides further that as soon as unit owners constitute a majority of the association's governing board, any management contract that was entered into prior to that date "shall terminate 90 days

after the first meeting of a governing board ... unless the board ... ratifies the contract or agreement." *Ibid.*

## B

██ "The condominium form of ownership is based upon the principle of shared ownership and shared responsibility." Wayne S. Hyatt, *Condominium and Homeowner Association Practice: Community Association Law* § 1.05(b)(1) at 14 (2d ed.1988). Because a condominium owner owns his or her unit with an undivided interest in the common elements, condominiums are referred to as "common-interest communities." The Restatement defines common-interest communities as those communities "in which the property is burdened by servitudes requiring property owners to contribute to maintenance of commonly held property or to pay dues or assessments to an owners association that provides services or facilities to the community." *Restatement (Third) of Property: Servitudes* § 6 (2000). A common-interest community is distinguishable from any other form of real property ownership because "there is a commonality of interest, an interdependence directly tied to the use, enjoyment, and ownership of property." Hyatt, *supra, Condominium and Homeowner Association Practice* § 2.01 at 25. Furthermore,

[a] common interest community is a community which is tied together with a strong common interest, whether that is property that is owned by the organization itself or whether it is property that is owned by the constituent members of that organization for which that organization has maintenance and control responsibility. It is a community in which there is a sharing of interests and a cohesiveness that comes not only from a legal structure but also from that sharing.

[Wayne S. Hyatt, *Condominiums and Homeowner Associations: A Guide to the Development Process* § 1.04 at 5 (1998).]

██ The Restatement explains that property owners in a common-interest community have "implied powers," meaning "all the powers reasonably necessary for management of the common property, administration of the servitude regime, and carrying out other functions set forth in the declaration." *Restatement (Third) of Property: Servitudes* § 6.4 cmt. a (2000). Although a statute or declaration may curtail those powers, "to the extent these

powers are necessary for maintenance of common property, limitations on the powers should be narrowly construed." *Ibid.* Accordingly, the association acts as the "collective vehicle" for the management of the commonly held property, and is the "structure, organization, and legal entity that is the method of operation for the planned unit development [ ] or condominium." Hyatt, *supra, Condominiums and Homeowner Associations: A Guide to the Development Process* § 1.04 at 5–6. See *Restatement (Third) of Property: Servitudes* § 6.3. The basic nature of an association is that it is a "privately owned and operated vehicle of service to a specific community." Wayne S. Hyatt, *The Community Association: An Introduction,* C500 *ALI–ABA* 363, 365 (1990). The association performs many functions, but "[p]erhaps its most important responsibilities are enforcement of the covenants agreed to by community members." David C. Drewes, Note, *Putting the "Community" Back Into Common Interest Communities: A Proposal For Participation–Enhancing Procedural Review,* 101 *Colum. L.Rev.* 314, 350 n. 9 (2001).

## C

The Condominium Act does not authorize the creation of umbrella associations as an appropriate association structure nor does it provide any source of power for umbrella associations to exist and operate. The Act states only that the legal structure of a condominium association may take the form of "any entity recognized by the laws of New Jersey, including but not limited to a business corporation or a nonprofit corporation." *N.J.S.A.* 46:8B–12. Nonetheless, even without statutory authorization, umbrella associations have been recognized and used as a governance scheme to oversee the common elements in certain planned unit developments. See *State v. Panther Valley Property Owners Ass'n,* 307 *N.J.Super.* 319, 327, 704 *A.*2d 1010 (App.Div.1998) (recognizing umbrella association to maintain private roadways and other common properties, *but noting that such association is not a condominium association under Condominium Act because*

planned unit development is "mix" of single-family residences, townhouses and condominiums, and that type of common interest development "has no statutory guidelines for its establishment" (emphasis added)); *Holbert v. Great Gorge Village South Condominium Council,* 281 *N.J.Super.* 222, 225, 656 *A.*2d 1315 (Ch.Div. 1994) (noting that umbrella association operated, managed, and administered common elements for six condominium communities in complex). As developers have chosen to give umbrella associations and not condominium associations the power to manage and oversee the common elements in condominium communities, questions have been raised about the scope of their authority. For example, umbrella associations generally exercise control over "recreational facilities, private streets serving more than one section and common open spaces" that are "operated and maintained ... for the benefit of all its members." Wendell A. Smith and Dennis A. Estis, *New Jersey Condominium and Community Association Law* § 4:1(c) (2000). However, "[c]ontrol over the encumbrance or disposition of common property within a section ... is almost universally retained by the constituent association." Delegating all duties and powers of the sectionalized associations to the umbrella association "renders them sterile from a functional standpoint. This fact often leads to frustration for the officers and trustees of the section associations, who then seek structural changes to afford themselves more participation and recognition." *Ibid.*

## III

The Kings Grant governance scheme, mandated by the Evesham Township Planning Board, plainly violates both the letter and spirit of the Condominium Act. When unit owners are required to delegate the day-to-day management of their unique common elements to an umbrella association, they lose their statutory power to control their undivided interest in their common elements. The Appellate Division observed that because there was "no statutory prohibition against Waters Edge making

such a delegation," the irrevocable delegation included in the Waters Edge Master Deed was lawful. That conclusion ignores the nature of condominium ownership and the fact that "common elements are titled to the unit owners—not to the association." Robert G. Natelson, *Condominiums, Reform, and the Unit Ownership Act*, 58 *Mont. L.Rev.* 495, 498–99 (1997).

Throughout the Condominium Act, the Legislature included provisions to ensure that the *unit owners*—not the developer—exercise control over their condominium boards, and by extension over their common elements. For example, the Act requires that once unit owners own seventy-five percent of the units in a condominium community, the unit owners, and not the developer, have the power to elect the majority of the association's board members. *N.J.S.A.* 46:8B–12.1(a). When that occurs, the Act requires the developer to "relinquish control of the association," and "deliver to the association all property of unit owners," including the minute books and records of the association, the association's funds and a roster of unit owners, addresses and telephone numbers. *N.J.S.A.* 46:8B–12.1(d). In addition, the Act prevents developers from entering into long-term employment, service or maintenance contracts before unit owners take control of the association's board. *N.J.S.A.* 46:8B–12.2. The Assembly statement that accompanied the bill creating that provision stated the following:

> Management of condominium common areas and recreational facilities is the function of the condominium association, control of which often remains in the hands of the condominium developer long after the condominium complex has been started and many individual units have been sold. This situation allows developers to enter into long-term management and other service-related contracts unfavorable to the unit owners which are binding on the association even after control of that association passes to the unit owners. In order to improve the rights of condominium owners in this regard, this bill would specify when control of the condominium association must pass to the unit owners and prohibit management contracts of longer than 2 years duration prior to such passage.
>
> [*Statement to Assembly Bill No. 182*, at 6 (1978).]

Contrary to the Appellate Division's decision, *N.J.S.A.* 46:8B–12.1 and *N.J.S.A.* 46:8B–12.2 reflect more than the orderly transition of power between the developer and unit owners. They

demonstrate the Legislature's understanding that in a condominium community, the unit owners' interests take precedence over any outside interest, whether that interest is a developer, an umbrella association, or any other outside party. Furthermore, those provisions demonstrate that condominium ownership differs significantly from traditional forms of property ownership, and that because unit owners have an undivided interest in their community's common elements any governance scheme that conflicts with the recognition of that interest is inconsistent with and in violation of the Act.

Here, as a condition for receiving the Evesham Township Planning Board's approval for the development of Kings Grant, the developer consented to a governance scheme that forced sectionalized communities within Kings Grant to give up power over their common elements to an umbrella association. The Condominium Act contains no provision giving the developer the right to use the property interests of Kings Grant unit owners as a bargaining chip for the developer's own interests. To the contrary, the Legislature included specific language in the Condominium Act to prevent a developer's lingering control over a condominium association. In the context of that statutory scheme, the developer was powerless to consent to the Evesham Township Planning Board's apparently unlawful condition that required individual condominium associations to delegate their statutory power over common elements to an umbrella association run by strangers.

The Appellate Division justified KGMA's control over the common elements in all sixteen Kings Grant communities by noting that there is a "delegate-based voting system" that allows individual unit owners within each community to elect a KGMA delegate to vote on behalf of the residents whom they represent. Although delegates represent the interests of each sectionalized community, the strength of a delegate's vote is measured by the number of units within his or her community. If a delegate represents a small condominium community, that delegate must enlist the

support of members of other communities within Kings Grant to vote on matters that directly affect that delegate's community. The Waters Edge delegate, for example, has only sixty-seven votes, compared to the 1,380 votes cast by the delegates from the other sectionalized communities within Kings Grant. Because the Waters Edge vote represents only 4.6 percent of the total votes cast on any matter, unit owners in fourteen other communities, six of which are not even condominium communities, are capable of deciding the most detailed aspects of how the Waters Edge common elements are to be managed, restricted and used. We find it inconceivable that the Legislature could have intended that unit owners from other communities, who do not own property in Waters Edge, could be empowered to control the details of the day-to-day management of Waters Edge's common elements.

Finally, we note that the Waters Edge Master Deed and Bylaws were ambiguous and could unfairly mislead a prospective purchaser to believe that the Waters Edge sub-association was solely responsible for managing the community's common elements. For example, section 4.00 of the Waters Edge Master Deed states that the Waters Edge condominium "shall be administered, supervised and managed by Waters Edge Condominium Association, Inc." Although the Master Deed briefly mentions KGMA in the preamble and states that "certain powers and duties" of the Waters Edge sub-association are irrevocably delegated to KGMA, the Master Deed focuses primarily on the Waters Edge sub-association, and includes no description or information concerning KGMA's authority over the Waters Edge common elements. Moreover, the Waters Edge Bylaws fail to provide additional information concerning what powers and duties are delegated to KGMA. Section 5.11 of the Waters Edge Bylaws details the extensive powers and duties of the Waters Edge sub-association, including the "upkeep, of the Buildings in the Condominium, the Common Elements ... the community and recreational facilities and all other property, real or personal, of the Association." Then, in section 5.12, all of the foregoing powers and duties are delegated to the KGMA as follows:

> It shall be the affirmative and perpetual obli[g]ation and duty of the Board [to] perform the powers and duties under paragraph 5.11 *et seq.*, all of which, together with all its powers, duties and responsibilities are hereby irrevocably delegated to the Board of Trustees of the Maintenance Association as the Board's attorney-in-fact and shall be coupled with an interest in the subject matter.

That language is written technically and could confuse a prospective Waters Edge unit owner about the dividing line between the KGMA and Waters Edge sub-association's powers because a unit owner easily could overlook or fail to appreciate that the Waters Edge sub-association's powers and duties set forth in detail in the Bylaws were irrevocably delegated to the KGMA.

Although we have no doubt that the irrevocable delegation of power over Waters Edge's common elements constitutes a violation of the Condominium Act, the delegation of limited powers to an umbrella association need not violate the Act. We do not believe it is inconsistent with the Act for an "umbrella association [to have] the responsibility for those other services that are considered to benefit all residents of the entire community uniformly." *Hyatt, supra, Condominiums and Home Owner Associations: A Guide to the Development Process* § 5.17. In that respect, we agree with the Appellate Division when it stated that "[b]ecause of the enormity of this planned unit development project, including the common roadway systems and similar maintenance needs, a single management association is necessary for the viability and maintenance of uniform standards throughout the development." However, the KGMA Declaration gave KGMA powers far beyond the maintenance of facilities used in common by all unit owners within the Kings Grant development, and provides for a broader delegation of power than the coordination of "privately owned streets, walkways, recreation, and other facilities" called for in the Evesham Township Planning Board's Resolution.

In our view, only a delegation of power to the umbrella association that was limited to roads, facilities and services shared by all or several of the communities within the Kings Grant project is reconcilable with the Act.

## III

The Legislature has not authorized municipalities or developers to diminish the statutory power of condominium unit owners to control their common elements. Absent that legislative authority, the mandated delegation of control over the Waters Edge common elements to an umbrella association run by strangers to Waters Edge directly violates the Condominium Act. Thus, we reverse the judgment of the Appellate Division. However, the Court recognizes that although KGMA may have entered into short or long-term service, management, maintenance or employment contracts, the scope of which exceed KGMA's authority as limited by our opinion in this appeal, we do not intend to disturb those existing agreements. Thus, we remand this matter to the Law Division to enter a judgment that alters the powers and responsibilities of KGMA and the Kings Grant condominium associations on a prospective basis consistent with this opinion.

Reversed and remanded.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.