13 A.3d 911

PAULINE JENNINGS, PLAINTIFF–APPELLANT, v. THE BOROUGH OF HIGHLANDS, THE MAYOR AND COUNCIL OF THE BOROUGH OF HIGHLANDS, THE CLERK OF THE BOROUGH OF HIGHLANDS, AND HIGHLANDER DEVELOPMENT GROUP, LLC, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued February 3, 2011—Decided March 14, 2011.

406

Before Judges AXELRAD, R.B. COLEMAN, and J.N. HARRIS.

*R. Armen McOmber* argued the cause for appellant (*McOmber & McOmber, P.C.,* attorneys; *Mr. McOmber,* of counsel and on the brief).

*Kerry E. Higgins* argued the cause for respondents Borough of Highlands, Mayor and Council of the Borough of Highlands, and Clerk of the Borough of Highlands (*McKenna, DuPont, Higgins & Stone, P.C.,* attorneys; *Edward J. McKenna, Jr.,* of counsel; *Ms. Higgins,* on the brief).

*Sam Maybruch* argued the cause for respondent Highlander Development Group, LLC (*Maybruch & Zapcic, LLC,* attorneys; *Mr. Maybruch, Allen Weiss,* and *Matthew R. Goode,* on the brief).

The opinion of the court was delivered by

JONATHAN N. HARRIS, J.A.D.

This appeal involves the previously unanswered question of whether individual condominium unit owners may oppose zoning amendments through a protest petition. It involves the interplay of the long-established right to protest zoning amendments, *N.J.S.A.* 40:55D–63, now found in the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –163, with this State's more recent recognition of common interest communities and condominium ownership as delineated in the Condominium Act (Condominium Act), *N.J.S.A.* 46:8B–1 to –38.

We agree with the Law Division that individual condominium unit owners do not enjoy the same measure of protest participation accorded other land owners by the MLUL. Accordingly, we affirm its conclusion that the involvement of individual condominium unit owners as signatories to a protest petition under *N.J.S.A.* 40:55D–63 does not make the targeted zoning amendment subject to an enhanced voting threshold pursuant to the MLUL. However, because we detect a different, yet fundamental, defect in the municipal proceedings that led to the adoption of the zoning amendment in this case, we reverse and declare the amendatory zoning ordinance invalid.

## I.

## A.

Defendant Borough of Highlands (the Borough [1]) is a compact 0.71–square mile municipality that in 2000 had a population of 5,097 persons. Defendant Highlander Development Group, LLC (Highlander) owns several acres of land located in the Borough's MH Mobile Home Residence District zone, upon which it established and operated the Shadow Lawn Mobile Home Park. Adjacent to Highlander's property is a fourteen-story residential high-rise structure comprised of 166 condominium apartment units plus common elements, formally known as "EASTPOINTE, a Condominium" (Eastpointe). Portions of Eastpointe's parking yards and open space are located within 200 feet of Highlander's property; none of its condominium apartment units lie within that 200–foot area.

On November 10, 2004, the Borough's Planning Board (Planning Board) adopted an amended and updated Master Plan. In the section devoted to the land use plan element, under the subheading entitled "Mobile Homes," the Master Plan addressed Highlander's property as follows:

The Shadow Lawn Mobile Home Park is approximately [twelve] acres in size and contains approximately 120 mobile home trailers. The tract in its entirety is irregularly shaped. Located on the top of the Highland's cliffs, adjacent to the slump blocks, the stability of the tract and the mobile homes that lie upon it require an engineering evaluation. The tract contains several areas of undulation; however, overall the tract contains a slope range appropriate for development. The location of the tract on the Highland's cliffs offer[s] exceptional views of Sandy Hook, the Shrewsbury River, and the Sandy Hook Bay.

The existing Mobile Home (MH) district permits mobile homes as the only permitted use within the MH district. This [Master] Plan acknowledges the trend for mobile home parks to evolve into uses that are more consistent with surrounding land use patterns. To permit the evolution of mobile home parks in the

---

[1] For ease of reference, unless the context demands otherwise, we shall refer to defendants (1) Borough of Highlands, (2) Mayor and Council of the Borough of Highlands, and (3) the Clerk of the Borough of Highlands collectively as the Borough.

Borough, this [Master] Plan recommends expanding the types of permitted uses in the MH district to include townhouses and single-family residential homes.

Given the unique attributes of the tract of land where the Shadow Lawn [M]obile [H]ome [P]ark is located, any future development of the tract should investigate a curvilinear development plan. Buildings should be designed and placed on the site so as to visually compl[e]ment each other and the natural landforms of the site. Consideration should be given to various types of multi-family development that give the flexibility to be creative while maintaining a reasonable density. This [Master] Plan specifically discourages long rows of townhouses that give the appearance of blank walls without articulation.

Under another subheading entitled "Specific Changes Recommended for the Land Development Ordinance," the Master Plan fortified the foregoing by suggesting that stakeholders should:

[d]iscuss the inclusion of additional permitted uses for the Mobile Home Park (Shadow Lawn) to allow the mobile home park to evolve into a land use more consistent with surrounding land uses over time.

More than two years later, on May 2, 2007, the Borough's governing body introduced Ordinance O–07–07, which sought to amend and supplement the zoning regulations found in Chapter 21 of the Borough's *Revised General Code*. The most provocative feature of Ordinance O–07–07 was its adding, as conditional uses in the MH Mobile Home Residence District zone, "[m]ulti-family dwellings and structured parking accessory or appurtenant thereto." There were no provisions for "single-family residential homes" as recommended by the Master Plan.

Additionally, the ordinance supplied standards and specifications for the proposed development of multi-family dwellings, along with requirements relating to the retirement of the mobile home park. Among the dimensional provisions were a height limitation of 180 feet (not including the height of attached parking structures) and a density of twenty units per acre. These provisions contemplated, but did not require, higher density high-rise development rather than lower density townhouse development.

A group of local residents opposed Ordinance O–07–07. They drafted and circulated a protest petition pursuant to *N.J.S.A.*

40:55D–63 [2] entitled, "Objection Petition to Proposed 'Zoning' Ordinance Amendment to Modify Section 21–89 MH Mobile Home Residence District O–07–07 to Permit Construction of High–Rise Towers on Shadow Lawn Park" (the first protest petition). The first protest petition, consisting of fifteen-pages of signatures, was filed with the Borough on June 18, 2007. The Borough Clerk later certified that it met the criteria of the statute to trigger the requirement of a super-majority vote—that is, a vote of four-to-one [3] rather than a simple majority—to make the ordinance effective.

Meanwhile, the governing body directed the Planning Board to undertake a review of Ordinance O–07–07 and provide recommendations pursuant to *N.J.S.A.* 40:55D–26(a) and –64. On June 14, July 12, and August 9, 2007, the Planning Board held public hearings, discussed the proposed ordinance, and adopted a resolution making findings and proposing recommendations to the governing body in eight discrete areas:

1. The Board finds that the high rise use proposed is consistent with the development in the area such as the [Eastpointe] site.

2. The Board recommends that the Governing Body develop detailed site regulations such as, but not limited to, bulk, density, and lot coverage regulations in order to [e]nsure consistency with the [Eastpointe] project and prevent overdevelopment of the site.

3. The Board recommends that the uses in the zone be expanded to include trailer homes in addition to single family, townhouse, high and mid-rise development.

4. The Board recommends that the maximum density and floor area ratio be limited to prevent overdevelopment of the site.

5. The Board finds that the use of the area for townhouse development would create a "sprawl effect" on the top of the hill and that the site is suited for a high rise use similar to East Pointe.

---

[2] The statute provides that no zoning amendment shall become effective following the filing of a protest petition "except by the favorable vote of two-thirds of all the members of the governing body of the municipality." *Ibid.*

[3] The Borough's governing body consisted of five members, thus requiring four affirmative votes to establish "two-thirds of all the members of the governing body of the municipality."

6. The Board recommends that the sewer capacity of the Borough system be reviewed and that the developer of the site be required to explore whether or not any development on the site can be connected to the Middletown Township system.

7. The Board recommends that the Borough Shade Tree Commission and garden club be given a role in the development of the site in relation to the protection of the site from excessive removal of trees and topping of trees.

8. The Board recommends that the steep slope issues be taken into consideration when adopting the final ordinance.

When it came time to consider the zoning amendment at a public hearing on September 5, 2007, (which had been previously adjourned from July 18 and August 3), the governing body unanimously voted to defeat Ordinance O–07–07. The Borough's meeting minutes reflect that the municipal attorney expressed concerns about the ordinance because: (1) counsel for Highlander had submitted a letter indicating it was challenging the sufficiency of the notice given to property owners within 200 feet of the affected zoning district and (2) the Planning Board had made recommendations for significant changes to the ordinance and the governing body had done nothing to reflect those recommendations. The vote followed the governing body's consideration of this advice, which also, instead of suggesting that the ordinance be tabled or the public hearing be rescheduled, recommended that a motion be entertained to defeat Ordinance O–07–07. When individual members of the governing body voted regarding the ordinance, none expressed reasons for his or her vote. Neither the defective notice nor the Planning Board's discordant recommendations was mentioned as a basis for voting against Ordinance O–07–07.

Highlander considered the governing body's defeat of Ordinance O–07–07 invalid, largely because of its view that there was no jurisdiction to vote on the ordinance because inadequate notice had been given to landowners situated within 200 feet of the affected zone. It believed that the defective notice rendered any action by the governing body regarding the ordinance invalid and void. A few weeks following the vote, it commenced an action in lieu of prerogative writs seeking to annul the vote. Additionally, even though the first protest petition played no role in the

governing body's considerations, Highlander sought a declaration that notwithstanding the certification of the Borough Clerk, this protest petition was insufficient to trigger the super-majority requirement of *N.J.S.A.* 40:55D–63.

The Borough proceeded to hire special counsel to advise it concerning its legislative odyssey and litigation strategy against Highlander. After reviewing the procedural history of Ordinance O–07–07 and researching applicable legal principles, special counsel advised the governing body, "the original notice of the July 18th hearing, which was carried to September 5th, was defective and accordingly the Borough Council had no jurisdiction to take any action on the ordinance at that time." Special counsel further opined, "the action of the council in allegedly 'defeating' the ordinance was a nullity and void as a matter of law." This legal advice aligned with Highlander's litigational position.

Based upon special counsel's opinion, the Borough sought to revive Ordinance O–07–07. New public notices were promulgated, served on all affected property owners, and published. The notice indicated that the governing body would conduct another public hearing (its third) concerning Ordinance O–07–07 on December 19, 2007. In response, a second protest petition was drafted and circulated, entitled, "Objection Petition to Proposed Zoning Amendment Ordinance O–07–07, On Re–Introduction for Second Hearing, Dec[ember] 19, 2007; to Modify Section 21–89 MH Mobile Home Residence District to Allow Construction of High–Rise Towers on Shadow Lawn Park, Blocks 105.107, Borough of Highlands, NJ" (the second protest petition).

A total of seventy-four condominium apartment unit owners from Eastpointe signed the second protest petition. However, the Eastpointe Condominium Association (Association), formed for condominium apartment unit owners to "take action with regard to the administration, management, maintenance, repair and operation of the Property of the Association," took no action and did not sign either the first or second protest petition.

The second protest petition was filed with the Borough on December 17, 2007. The Borough Clerk did not review or certify the second protest petition prior to the December 19, 2007 hearing conducted by the governing body.

At the December 19, 2007 hearing, special counsel publicly expressed his opinions regarding the travails of Ordinance O-07-07. He recommended that the governing body delay no further, and vote on the ordinance that night, but only after considering the views of members of the public who would be given a time-limited opportunity to speak. Thereafter, if a super-majority vote were not achieved, he would review the protest petitions, perhaps taking at least thirty days to do so, to determine if they triggered a need for a super-majority vote. However, it was understood that if four affirmative votes were garnered, a review of the protest petitions would be rendered moot.

The transcript[4] of the public hearing indicates that the public comments were uniformly opposed to the zoning amendment. That transcript does not include any specific discussion by the governing body about the Planning Board's report and recommendations regarding Ordinance O-07-07. However, in casting a vote in favor of the ordinance, one member of the governing body expressed reservations about "the site regulation set in the ordinance" and urged the Planning Board, if any application for development were to be subsequently filed for the Highlander property, "to look at not only safety, but also density, impact, and environmental issues to nearby residential homes." Another member of the governing body noted, "to allow two high rises to be built, which, and you know, I realize, the planning board is going to have jurisdiction over it, these are also the people who sent this ordinance to us, so there's no doubt they're going to be

---

[4] The record on appeal does not contain the minutes of the December meeting, although we were provided with the September minutes. Our review of those minutes, together with the transcript of the September meeting, reveals that no mention was made about the Planning Board report and recommendations except for the comments of the municipal attorney noted earlier concerning discordant recommendations.

all for it." With that, he concluded, "I'm going to have to vote no." The governing body ultimately voted three to two to adopt the zoning amendment, which impelled special counsel to undertake the review of the protest petitions as promised.

Several weeks later, on February 6, 2008, at a public meeting of the governing body, special counsel presented his formal report about the protest petitions. He stated that he had examined both protest petitions and concluded that a super-majority vote was not necessary because neither protest petition had enough proper signatures pursuant to the criteria set forth in *N.J.S.A.* 40:55D–63 to account for twenty percent of the lots or land directly affected by the ordinance.

Statements and comments from the public followed, including a request for a thirty-day reprieve to allow for responses to special counsel's report, and time to cure any putative defects in the protest petitions. The governing body rejected these requests, and then (1) voted to accept the report and follow the advice of special counsel; (2) declared both protest petitions "deficient" and thereby insufficient to trigger the super-majority vote pursuant to *N.J.S.A.* 40:55D–63; and (3) "certifie[d] the passage of Ordinance O–07–07."

## B.

As already noted, at the time the governing body reconsidered, and then adopted, Ordinance O–07–07, the Borough was already being sued by Highlander. On January 7, 2008, plaintiff Pauline Jennings (Jennings) filed a separate action in lieu of prerogative writs against the Borough seeking, among other things, a declaration that Ordinance O–07–07 was ineffective for want of a super-majority vote. The complaint also sought remedies for Jennings's supposed deprivation of constitutional rights, relying upon the Federal Civil Rights Act of 1871, 42 *U.S.C.A.* § 1983 (Section 1983).[5]

---

[5] Jennings's federal claim, seeking joint and several liability against the municipal entities, pursued "punitive damage[s] and exemplary damages, attorney's

On January 24, 2008, the Law Division ordered Jennings's complaint dismissed without prejudice, but permitted her to intervene in the earlier case filed by Highlander. On March 3, 2008, she filed a complaint in intervention in Highlander's action, which mirrored her January pleadings. On March 20, 2008, she filed an amended complaint in intervention, adding a claim decrying Ordinance O–07–07 as impermissible spot zoning.

On June 19, 2008, the Law Division entered a case management order providing that (1) Highlander's complaint against the Borough would be dismissed, (2) Jennings's amended complaint in intervention would proceed, and (3) Highlander would now become a defendant in Jennings's lawsuit. The pleadings were reconfigured to reflect these changes.

On September 30, 2008, the Law Division issued a written opinion denying Jennings's motion to permit expert testimony at trial regarding two issues: (1) the accuracy of a map used to calculate the percentage of protesters in the second protest petition and (2) the land use aspects of the spot zoning claim. The court characterized the protest petition issue as purely a legal issue for which expert opinion was unwarranted, and bluntly found, "spot zoning is [not] an issue in the matter."

On February 5, 2009, the Law Division entered its final pretrial order, which refined the issues in dispute, set a briefing schedule, identified the documentary exhibits, and listed the matter for trial. Among its provisions, this order memorialized Jennings's concession "that the issue of whether either of the [p]rotest [p]etitions

---

fees, costs of investigation and expert fees together with interest and costs of suit." The stated grievance for which these remedies were sought was the following:

> Defendants, acting under cover [sic] of a state law, willfully, intentionally, knowingly and concertedly defied [sic] [Jennings] of rights secured by the Constitution and laws of the United States, including the Fourth and Fourteenth Amendments by combining and conspiring to deprive [Jennings] of her constitutionally protected rights and denying [Jennings] due process of law in violation of [Section 1983].

was signed by [twenty] percent or more of the protest eligible area rests on the validity of the signatures from the Eastpointe Condominium."

The matter was tried on a documentary record, without testimony, on July 2, 2009, and the court reserved decision. On August 31, 2009, the Law Division issued a written opinion holding that the governing body properly adopted Ordinance O–07–07 without a super-majority vote. Final judgment was entered on September 16, 2009, dismissing Jennings's amended complaint with prejudice.[6] This appeal followed.

## II.

### A.

The standard of review in this appeal is de novo, because it presents issues of statutory interpretation. *In re Liquidation of Integrity Ins. Co.*, 193 *N.J.* 86, 94, 935 *A.*2d 1184 (2007) (citing *Toll Bros., Inc. v. Twp. of W. Windsor*, 173 *N.J.* 502, 549, 803 *A.*2d 53 (2002)). Because we must address purely legal issues—(1) the intersection of the MLUL and the Condominium Act; (2) the application of *N.J.S.A.* 40:55D–26(a); and (3) the propriety of the dismissal of the spot zoning claim—we owe no deference to the trial court's legal conclusions. *See In re Petition for Referendum on City of Trenton Ordinance 09–02*, 201 *N.J.* 349, 358, 990 *A.*2d 1109 (2010) (citing *Manalapan Realty v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995)).

### B.

■ Our first task is to determine whether the protest petitions triggered a super-majority vote in order for Ordinance O–07–07 to

---

[6] We presume that because the final pretrial order did not include Jennings's federal claims as issues to be decided at trial, even though that same order stated that no issues were abandoned, her federal civil rights action was not pursued. The Law Division's written opinion makes no mention of the federal allegations in the amended complaint, and we consider the dismissal of those claims not to be part of this appeal.

become effective. The notice and protest provision of the MLUL provides:

Notice of the hearing on an amendment to the zoning ordinance proposing a change to the classification or boundaries of a zoning district, exclusive of classification or boundary changes recommended in a periodic general reexamination of the master plan by the planning board pursuant to section 76 of P.L.1975, c. 291 (C. 40:55D–89), shall be given prior to adoption in accordance with the provisions of section 2 of P.L.1995, c. 249 (C. 40:55D–62.1). A protest against any proposed amendment or revision of a zoning ordinance may be filed with the municipal clerk, signed by the owners of 20% or more of the area either (1) of the lots or land included in such proposed change, or (2) of the lots or land extending 200 feet in all directions therefrom inclusive of street space, whether within or without the municipality. Such amendment or revision shall not become effective following the filing of such protest except by the favorable vote of two-thirds of all the members of the governing body of the municipality.

[*N.J.S.A.* 40:55D–63.]

On its face, this statute confers significant rights only to a limited class of persons: owners of "lots or land" included within, or located 200 feet in all directions from, the locale of the proposed zoning amendment, regardless of municipal boundaries. In interpreting this statute, we endorse the pragmatic approach of the Law Division and its utilization of the rationale expressed in *Friends of Dinky Woods v. Township of West Windsor,* 291 *N.J.Super.* 325, 333, 677 *A.*2d 289 (Law Div.1996), for the proposition that *N.J.S.A.* 40:55D–63 provides protest-eligibility to only those lots or land lying within the 200–foot perimeter, and not to entire properties that have a portion of land within the 200–foot area. Thus, as the parties recognized, the only relevant "lots or land" located within the Eastpointe condominium development were those common elements found within the 200–foot penumbra, and not to all of the lands and structures within the entire condominium regime.

The New Jersey Supreme Court has characterized a condominium unit owner as having "fee simple title to and enjoy[ing] exclusive ownership of his or her individual unit while retaining an undivided interest as a tenant in common in the facilities used by all of the other unit owners." *Fox v. Kings Grant Maint. Ass'n Inc.,* 167 *N.J.* 208, 219, 770 *A.*2d 707 (2001) (citing *Siller v. Hartz Mountain Assocs.,* 93 *N.J.* 370, 375, 461 *A.*2d 568 (1983), *cert.*

*denied,* 464 *U.S.* 961; 104 *S.Ct.* 395, 78 *L.Ed.*2d 337 (1983)). Said another way, a condominium owner is the holder of a hybrid real property interest consisting of two distinct dominions. The first involves individual title to, and exclusive control over, some defined space, here a condominium apartment unit. The second vests shared title to land, building exteriors, parking areas, and other facilities intended for common use. *See* Smith, Estis & Li, *New Jersey Condominium & Community Association Law* § 2:4 (Gann 2011).

These common areas, defined by *N.J.S.A.* 46:8B-3(d) as common elements, are assigned proportionate undivided interests to each condominium owner. *N.J.S.A.* 46:8B-6; *Brandon Farms Prop. Owners Ass'n, Inc. v. Brandon Farms Condo. Ass'n, Inc.,* 180 *N.J.* 361, 368, 852 *A.*2d 132 (2004). Title to the common elements cannot be separated from title to the units; ownership of common elements cannot be partitioned. *N.J.S.A.* 46:8B-6.

Because of the shared nature of common elements, the Condominium Act provides a mechanism—the condominium association as defined in *N.J.S.A.* 46:8B-3(b)—to oversee and administer these interests. A condominium association is composed of unit owners. *N.J.S.A.* 46:8B-9(k), -12, -12.1. Its operations are governed not only by the Condominium Act, but also through the contents of the master deed and the condominium by-laws. *N.J.S.A.* 46:8B-13, -14, -15. The condominium association does not, generally, own legal title to the common elements. Legal as well as beneficial title to common elements is held by condominium unit owners individually. *See* Smith, et. als, *supra,* § 2:4.

The governing body of a condominium association has a fiduciary obligation to the unit owners "similar to that of a corporate board to its shareholders." *Kim v. Flagship Condo. Owners Ass'n,* 327 *N.J.Super.* 544, 550, 744 *A.*2d 227 (App.Div.), *certif. denied,* 164 *N.J.* 190, 752 *A.*2d 1292 (2000); *see also Thanasoulis v. Winston Towers 200 Ass'n, Inc.,* 110 *N.J.* 650, 656–57, 542 *A.*2d 900 (1988); *Siller, supra,* 93 *N.J.* at 382, 461 *A.*2d 568. "A condominium association's governing body has 'the duty

to preserve and protect the common elements and areas for the benefit of all its members.'" *Siddons v. Cook,* 382 *N.J.Super.* 1, 7, 887 *A.*2d 689 (App.Div.2005) (quoting *Kim, supra,* 327 *N.J.Super.* at 550, 744 *A.*2d 227). Condominium association board members are required to "act reasonably and in good faith in carrying out their duties." *Papalexiou v. Tower West Condo.,* 167 *N.J.Super.* 516, 527, 401 *A.*2d 280 (Ch.Div.1979).[7]

From these firmly established principles governing common interest condominium communities, we conclude that individual Eastpointe condominium apartment unit owners do not qualify as owners of "lots or land" regarding the common elements located within 200 feet of Ordinance O–07–07's reach. These common elements—as opposed to individual condominium units or limited common elements such as a unit's terrace or patio—do not endow dominion and control to individual protest petition signatories. Such signatories do not obtain individual autonomy over these "lots or land" because their interests in the common elements are shared with other condominium owners as governed by the Condominium Act.

Instead, consistent with the Condominium Act's delegation to the condominium association of significant powers over common elements, we believe that the responsibility to decide whether to engage in an MLUL protest petition resides not in individual condominium unit owners, but rather in the association. We recognize the anomaly that the condominium association does not own the "lots or land" embraced within the common elements. Nevertheless, we confer upon it the rights of an owner of "lots or land" under the MLUL to ensure that the legislative purpose of *N.J.S.A.* 40:55D–63 is fulfilled, where, unless a voice is given to protest pursuant to the MLUL, disenfranchisement of such right would be lost for all concerned. Even though they cannot effec-

---

[7] Recent legislative efforts to fortify the rights of homeowners living in shared ownership communities have yet to be fulfilled. *See The Owners' Rights and Obligations in Shared Ownership Communities Act,* S.1371, 214th Leg. (N.J. 2010); A.1443, 214th Leg. (N.J.2010).

tively sign a protest petition, this does little violence to other significant rights of condominium unit owners, who still enjoy a myriad of individual privileges, including the right to lobby the association, to speak out at public hearings, and to cast ballots in municipal elections. In addition, this result adequately harmonizes the Condominium Act with the MLUL.

The right to protest zoning amendments has existed in this State for more than eighty years. *Campbell v. Borough of N. Plainfield,* 404 *N.J.Super.* 337, 355, 961 *A.*2d 770 (App.Div.2008) (citing *Levin v. Twp. of Parsippany–Troy Hills,* 82 *N.J.* 174, 182, 411 *A.*2d 704 (1980)). This right, and the parallel necessity for a zoning amendment to garner approval by an enhanced majority if the statutory conditions were met, derives from the legislative desire to protect affected property owners from "unwanted or ill-considered change." *Johnson v. Twp. of Montville,* 109 *N.J.Super.* 511, 517, 264 *A.*2d 75 (App.Div.1970). "[T]he Legislature intended that, as a general rule, a protested zoning change should be more difficult to pass than an amended zoning ordinance, not subject to protest." *Mountain Hill, LLC v. Middletown Twp.,* 353 *N.J.Super.* 57, 66, 801 *A.*2d 412 (App.Div.), *certif. denied,* 175 *N.J.* 78, 812 *A.*2d 1110 (2002).

The public policy underlying the MLUL's protest provision, however, recognizes that not all affected citizens enjoy equal rights. For example, because they are not owners of "lots or land," tenants in a high rise apartment building could add nothing material to a protest petition under *N.J.S.A.* 40:55D–63, but they would not forfeit the full array of civil rights to speak and write against a zoning amendment, and to exercise the franchise to vote in local elections. Nor would any such interested parties lose the ability to vindicate their grievances in a court of law.

The MLUL's course is charted in a way to enable only owners of "lots or land" to trigger the augmented voting threshold. The statute does not permit persons who merely have an interest in real property to execute a protest petition. The Legislature could have written a broader provision to include part owners of a

property, but elected otherwise. Tenants, mortgagees, lien holders, judgment creditors, contract purchasers, beneficiaries, and persons with future interests cannot validly execute a protest petition. Because individual condominium owners do not own their common elements outright, their individual signatures cannot vitalize a valid protest. Instead, consonant with the hybrid property interest provided by the Condominium Act, it is the condominium association that must speak on behalf of the "lots or land" under its management and control. We thus agree with the Law Division that Eastpointe's individual condominium apartment unit owners did not enjoy the full measure of protest, and the inclusion of the area of land within Eastpointe contravened *N.J.S.A.* 40:55D–63. Ordinance O–07–07 was not rendered ineffective by the vote of three to two.

## C.

We next turn to the first basis for our disagreement with the Law Division, which involves the governing body's failure to review the report and recommendations of the Planning Board pursuant to *N.J.S.A.* 40:55D–26(a). From the record presented to us, the governing body abdicated its duty to legislatively review the Planning Board's handiwork. The governing body did not change or reject any part of the Planning Board's recommendations to be sure, but that is largely because it ignored them. This willful disregard is contrary to the MLUL.[8]

In keeping with the hallmark of planning required by the MLUL, we view *N.J.S.A.* 40:55D–26(a) as imposing a mandatory

---

[8] We also note that the Planning Board's recommendation—"that the uses in the zone be expanded to include trailer homes in addition to single family, townhouse, high and mid-rise development"—does not appear to fully square with the 2004 Master Plan's more limited recommendation for only "expanding the types of permitted uses in the MH district to include townhouses and single-family residential homes." Furthermore, the governing body did not address the discordance of its allowing high-rise, high density multi-family developments, but omitting single-family residential homes from the zoning amendment, notwithstanding the Planning Board's contrary proposal.

duty upon a governing body to "review the report of the planning board." In this case, the governing body gave no signs of complying with the plain language of the statute. Stray references to the existence of the report of the Planning Board do not suffice to convince us that the obligatory review was performed. Indeed, the utter silence of the governing body regarding the Planning Board's report at the December 19, 2007 hearing, coupled with the alert that was sounded at the earlier September 5, 2007 hearing regarding the Planning Board's recommendations for significant changes to the ordinance, further convince us that the review requirement was either deliberately ignored or slipped through the cracks of the contentious legislative process.

We do not believe that the Legislature asks too much of municipal governing bodies when it insists upon a review of a planning board's report. In an analogous situation, where planning board members voted on an application for development without discussion, we held that a verbal discussion in that circumstance is not mandatory, as long as the ultimate resolution, which will serve as the official statement of the planning board's findings and conclusions is "furnished to the board members in advance of the time they will vote, to provide them ample time to study it and, if they deem it appropriate, request clarifications or modifications." *Scully–Bozarth Post # 1817 of Veterans of Foreign Wars of U.S. v. Planning Bd. of Burlington,* 362 *N.J.Super.* 296, 312, 827 *A.*2d 1129 (App.Div.), *certif. denied,* 178 *N.J.* 34, 834 *A.*2d 407 (2003). We further implied that members should acknowledge "on the record that they read it, understood it, and agreed with it as drafted." *Id.* at 313, 827 *A.*2d 1129.

In similar vein, we believe that members of a governing body acting pursuant to *N.J.S.A.* 40:55D–26(a) owe an implied duty under the MLUL to at least acknowledge that they reviewed the planning board's report. The record in this case provides us little confidence that any review occurred. Moreover, we believe that a remand to the governing body would be futile—a vain effort to backfill the missing acknowledgment, and we decline to order a

do-over. We therefore conclude that this material violation of *N.J.S.A.* 40:55D–26(a) renders Ordinance O–07–07 invalid.

### D.

■ Lastly, we address the spot zoning issue. We recognize that by finding Ordinance O–07–07 invalid, the spot zoning issue is arguably moot. Nevertheless, we have elected to address it in order to provide guidance in the event that a future ordinance is adopted in response to this opinion. *See Reilly v. AAA Mid-Atlantic Ins.*, 194 *N.J.* 474, 484, 946 *A.2d* 564 (2008) (declining to invoke the doctrine of mootness on an issue implicating important public policy); *Joye v. Hunterdon Cent. Reg'l High School Bd. of Educ.*, 176 *N.J.* 568, 583, 826 *A.2d* 624 (2003) (an issue may not be rendered moot if it is capable of repetition).

Jennings claims that the Law Division erred in dismissing her cause of action challenging the ordinance on the ground that it constituted spot zoning. In its September 30, 2008 interlocutory opinion, the trial court barred Jennings from presenting expert planning testimony on the issue of whether Ordinance O–07–07 constituted spot zoning. Although it was deciding a discovery motion, the court analyzed the issues as if it were a dispositive summary judgment application. In so doing, it concluded that "[t]he ordinance in this case does not re-zone a district, but it adds a conditional use to an already existing zone. Therefore, illegal spot zoning is not an issue in this case and no expert testimony should be permitted." We disagree with this narrow view of the elements of spot zoning and reverse in order to give guidance in the event that litigation ensues over a future enactment.

■ " 'Spot zoning' is the use of the zoning power to benefit particular private interests rather than the collective interests of the community." *Taxpayers Ass'n of Weymouth Twp., Inc. v. Weymouth Twp.*, 80 *N.J.* 6, 18, 364 *A.2d* 1016 (1976), *cert. denied sub nom.*, 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.2d* 373 (1977). Spot zoning occurs when a municipality seeks to relieve a particular property of the burden imposed by its zoning classification so as to

benefit the lot owner or permit an incompatible use. *Cresskill v. Borough of Dumont,* 15 *N.J.* 238, 249–51, 104 *A.*2d 441 (1954). It is essentially an invalid attempt to grant a variance. *Id.* at 251, 104 *A.*2d 441.

As explained by the Supreme Court, "[s]pot zoning is the antithesis of ... planned zoning.... [T]he test is whether the particular provision of the zoning ordinance is made with the purpose or effect of furthering a comprehensive scheme or whether it is designed merely to relieve a lot or lots from the burden of a general regulation." *Palisades Props., Inc. v. Brunetti,* 44 *N.J.* 117, 134, 207 *A.*2d 522 (1965). "In the case of spot zoning, the owner of a particular parcel seeks to reap the benefit of a zoning decision, by special ordinance or by variance, which treats his or her property more favorably than the comprehensive plan would allow, to the detriment of the larger community or the immediate neighbors." *Riya Finnegan, LLC v. Twp. Council of S. Brunswick,* 197 *N.J.* 184, 198–99, 962 *A.*2d 484 (2008).

The Law Division's determination to deny Jennings an expert planner and dismiss her claim of spot zoning ran afoul of giving a litigant a fair opportunity to prove the elements of the cause of action. Because spot zoning claims are particularly fact-sensitive, we differ with the Law Division's view that the issue could be resolved as a matter of law. *Cf. Tennis Club Assocs. v. Planning Bd. of Teaneck,* 262 *N.J.Super.* 422, 432, 621 *A.*2d 79 (App.Div.1993) (purely legal issue as to whether an ordinance violated the MLUL is to be decided by the court); *Cherney v. Matawan Borough Zoning Bd. of Adjustment,* 221 *N.J.Super.* 141, 144–45, 534 *A.*2d 41 (App.Div.1987) (interpretation of the ordinance against undisputed facts is a judicial function). Since a spot zoning claim is essentially a challenge to the reasonableness of an ordinance, "an evidentiary hearing must be held to afford both the party challenging the ordinance and the municipality an opportunity to present expert testimony relevant to a determination of its validity." *Sartoga v. Borough of W. Paterson,* 346 *N.J.Super.* 569, 579, 788 *A.*2d 841 (App.Div.), *certif. denied,* 172 *N.J.* 357, 798 *A.*2d

1270 (2002);  *see also Hirth v. City of Hoboken,* 337 *N.J.Super.* 149, 166, 766 *A.*2d 803 (App.Div.2001).

For these reasons, we view Jennings' spot zoning claim to have been improvidently dismissed.  In so determining, we express no opinion on the merits of her theory and leave it to ordinary adversarial processes to gauge whether she could ever convince a trier of fact of the merits of such a claim.

### E.

Jennings has raised several other points in this appeal, including (1) a challenge to the Borough's right to resuscitate Ordinance O–07–07 after its defeat in September 2007;  (2) an assertion that the Borough's process of reviewing the protest petitions was either unauthorized or improperly done;  (3) a claim that the manner of conducting the public hearing on Ordinance O–07–07 in December 2007 was invalid;  and (4) an argument that *N.J.S.A.* 40:55D–63 requires a protest petition to be either validated or rejected prior to voting on a zoning amendment.  In view of our determination that Ordinance O–07–07 is invalid, we need not address these arguments.

Reversed.